

**SCHLACTER & ASSOCIATES**
**Attorneys for Plaintiff**
**450 Seventh Avenue**
**New York, New York 10123**
**(212) 695-2000**
**By: JED R. SCHLACTER (JRS-4874)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

FU DA INTERNATIONAL LTD.,                  :

              **Plaintiff,**                  :

   - against -                  :          **COMPLAINT**

KOHL'S DEPARTMENT STORES, INC.,                  :

             **Defendant.**                  :

----------------------------------------------------------------X

08 Civ.

08 CV 5164

      Plaintiff Fu Da International Ltd., by its attorneys, Schlacter & Associates, as and for its Complaint against the defendant, Kohl's Department Stores, Inc., alleges as follows:

### JURISDICTION AND VENUE

      1.     This action, as more fully stated below, is for, <u>inter alia,</u> breach of contracts, breach of the implied covenant of good faith and fair dealing, fraud, restitution, quantum meruit and unjust enrichment.

      2.     This Court has jurisdiction of this action pursuant to 28 U.S.C. Section 1332(a)(1) because the amount in controversy exceeds $75,000.00 exclusive of interest and costs, and is between citizens of different States.

3.    Venue is proper in this district under 28 U.S.C. Section 1391(a).  Process properly issues from this Court pursuant to Rule 4 of the Federal Rules of Civil Procedure.

## THE PARTIES

4.    During all times relevant herein, plaintiff Fu Da International Ltd. ("Fu Da"), was and is a corporation organized, operating and existing under the laws of the State of New York, having its principal place of business at 525 Seventh Avenue, New York, NY 10018.

5.    During all relevant times herein, defendant Kohl's Department Stores, Inc. ("Kohl's"), was and is a corporation organized, operating and existing under the laws of the State of Delaware, with offices at N56 W17000 Ridgewood Drive, Menomonee Falls, Wisconsin 53051.  Kohl's owns and operates large department stores throughout the United States, including in the New York metropolitan area, and purchased merchandise for retail stores from Fu Da.

## FIRST CAUSE OF ACTION: BREACH OF CONTRACT - GOODS SOLD AND DELIVERED (APRIL 2008 DELIVERY)

6.    In and around the period from April 1, 2008 through April 4 2008, at the specific instance and request of the defendant, the plaintiff shipped and delivered to defendant, ladies' garments, at the agreed price and reasonable value of $306,872.64 (hereinafter sometimes referred to as the "April 2008 Delivery").

7.    All of said garments were delivered to defendant; accepted by defendant without complaint or objection; and used by defendant.

8.    A detailed listing of the items purchased and received by defendant is as follows:

| Invoice Date | Invoice # | Agreed Price & Reasonable Value |
|---|---|---|
| 4/1/08 | 83467 | $  979.20 |
| 4/4/08 | 83481 | 38,082.24 |
| 4/4/08 | 83482 | 20,522.88 |
| 4/4/08 | 83483 | 70,084.80 |
| 4/4/08 | 83484 | 60,739.20 |
| 4/4/08 | 83485 | 74,914.56 |
| 4/4/08 | 83486 | 41,549.76 |
| **Total:** | | **$306,872.64** |

9.    The defendant has failed to pay for the April 2008 Delivery referred to in Paragraph 8 above, that was shipped, received by it, and accepted by it, although the plaintiff has made repeated demands for payment.

10.    As a result of the defendant's failure to pay to the plaintiff the sum of $306,872.64, it has breached its agreement with plaintiff.

11.    As a consequence thereof, the plaintiff has been damaged in the sum of $306,872.64.

## SECOND CAUSE OF ACTION - ACCOUNT STATED

## FOR GOODS SOLD AND DELIVERED (APRIL 2008 DELIVERY)

12.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 11 as though more fully set forth herein.

13.     In and around April 2008, the plaintiff delivered to the defendant invoices totaling $306,872.64 for goods sold and delivered to defendant (the April 2008 Delivery).

14.     The invoices were received and retained by the defendant without objection.

15.     As a consequence of the above, an account was stated between the plaintiff and the defendant in the sum of $306,872.64, no part of which has been paid although duly demanded.

16.     As a consequence thereof, the plaintiff has sustained damages in the sum of $306,872.64.

## THIRD CAUSE OF ACTION - UNJUST ENRICHMENT
## FOR GOODS SOLD AND DELIVERED (APRIL 2008 DELIVERY)

17.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 16 as though more fully set forth herein.

18.     By virtue of the defendant's receipt and acceptance of the merchandise referred to above (the April 2008 Delivery), and the defendant's failure to remit payment for same, the defendant has been unjustly enriched in the amount of $306,872.64.

19.     Accordingly, defendant is indebted to plaintiff in the sum of $306,872.64.

## FOURTH CAUSE OF ACTION - QUANTUM MERUIT

## FOR GOODS SOLD AND DELIVERED (APRIL 2008 DELIVERY)

20.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 19 as though more fully set forth herein.

21.    At defendant's specific request, plaintiff did supply ladies' garments to defendant (the April 2008 Delivery), in the reasonable value of $306,872.64.

22.    The defendant accepted and used said garments.

23.    The defendant has failed and refused to pay for the reasonable value of said garments, although duly demanded.

24.    As a consequence of the above, the plaintiff has sustained damages in the sum of $306,872.64.

## FIFTH CAUSE OF ACTION

## ANTICIPATORY BREACH - GOODS SOLD AND DELIVERED

## (MAY 2008 DELIVERY)

25.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 24 as though more fully set forth herein.

26.    In and around the period from May 5, 2008 through May 13, 2008, at the specific instance and request of the defendant, the plaintiff shipped and delivered to defendant, ladies'

garments, at the agreed price and reasonable value of $521,336.16 (hereinafter sometimes referred to as the "May 2008 Delivery").

27.    All of said garments in the May 2008 Delivery were delivered to defendant.

28.    A detailed listing of the items purchased and received by defendant in the May 2008 Delivery is as follows:

| Invoice Date | Invoice # | Agreed Price & Reasonable Value |
|---|---|---|
| 5/5/08 | 84238 | $ 25,953.12 |
| 5/5/08 | 84239 | 42,867.36 |
| 5/5/08 | 84240 | 18,915.84 |
| 5/5/08 | 84241 | 18,780.48 |
| 5/5/08 | 84242 | 1,821.60 |
| 5/5/08 | 84243 | 62,936.64 |
| 5/5/08 | 84244 | 1,144.80 |
| 5/13/08 | 84844 | 5,512.32 |
| 5/13/08 | 84845 | 47,328.48 |
| 5/13/08 | 84846 | 72,878.40 |
| 5/13/08 | 84847 | 38,364.48 |
| 5/13/08 | 84848 | 34,493.76 |
| 5/13/08 | 84849 | 108,724.32 |
| 5/13/08 | 84850 | 341.28 |
| 5/13/08 | 84851 | 41,273.28 |
| **Total:** | | **$521,336.16** |

29.    Although the above invoices are due to be paid on June 4, 2008 and/or June 12, 2008, the defendant has indicated to plaintiff that it has no intention of paying for the May 2008 Delivery, thereby anticipatorily breaching its agreement with plaintiff to pay for said merchandise.

30.    Defendant has no grounds to refuse payment for the merchandise ordered by defendant; delivered to defendant; and accepted by defendant, in the May 2008 Delivery.

31.    As a result of the defendant's anticipatory breach of its agreement, the plaintiff has been damaged in the sum of $521,336.16.

## SIXTH CAUSE OF ACTION

## UNJUST ENRICHMENT - GOODS SOLD AND DELIVERED

## (MAY 2008 DELIVERY)

32.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 31 as though more fully set forth herein.

33.    By virtue of the defendant's receipt and acceptance of the merchandise referred to above (the May 2008 Delivery), and the defendant's intent to refuse to remit payment for same, the defendant has been unjustly enriched in the amount of $521,336.16.

34.    Accordingly, defendant is indebted to plaintiff in the sum of $521,336.16.

## SEVENTH CAUSE OF ACTION

## QUANTUM MERUIT - GOODS SOLD AND DELIVERED

## (MAY 2008 DELIVERY)

35.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 34 as though more fully set forth herein.

36.    At defendant's specific request, plaintiff did supply ladies' garments to defendant (the May 2008 Delivery), in the reasonable value of $521,336.16.

37.    The defendant accepted said garments.

38.    The defendant has indicated that it will fail and refuse to pay for the reasonable value of said garments, without justification.

39.    As a consequence of the above, the plaintiff has sustained damages in the sum of $521,336.16.

## EIGHTH CAUSE OF ACTION - BREACH OF CONTRACT - IMPROPER CANCELLATIONS

### ORDER 4815165:

40.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 39 as though more fully set forth herein.

41.    In and around July/August 2006, the defendant ordered from plaintiff, and the plaintiff agreed to sell to defendant, ladies' activewear garments including microfiber track pants and French terry hooded jackets, for the total sum and agreed price of $217,338.00.

42.    Thereafter, the defendant requested that the plaintiff hold off on delivering the merchandise referred to in Paragraph 41 above.

43.    On or about October 26, 2007 the defendant sent to plaintiff a confirmatory document, confirming defendant's agreement to purchase the merchandise referred to in Paragraph 41 above.  Said confirmatory document is identified as defendant's "EDI Blanket Order No. 4815165" (hereinafter referred to as "Order 4815165").

44.    On or about February 28, 2008 the defendant sent to plaintiff a revised EDI Blanket Order No. 4815165, changing the date for shipment of the merchandise covered by Order 4815165.

45.    The merchandise covered by Order 4815165 was ultimately scheduled to be shipped to defendant at the end of June 2008.

46.    The plaintiff, in accordance with its agreement with defendant to produce, sell and ship the merchandise covered by Order 4815165, did in fact produce said merchandise.

47.    The plaintiff has been ready, willing and able to deliver the merchandise covered by Order 4815165 in accordance with the agreement with defendant.

48.    However, on or about May 9, 2008 the defendant unilaterally canceled Order 4815165 without prior notice; without justification; and contrary to the agreement between plaintiff and defendant.

49.    As a consequence of defendant's breach of its agreement to take in and pay for the merchandise covered by Order 4815165, the plaintiff has sustained damages in the minimum sum of $217,338.00.

**ORDER 4719904:**

50.    In and around December 2006, the defendant ordered from plaintiff, and the plaintiff agreed to sell to defendant, ladies' capri pants and rib tank tops, for the total sum and agreed price of $263,782.00.

51.    Thereafter, the defendant requested that the plaintiff hold off on delivering the merchandise referred to in Paragraph 50 above.

52.    On or about June 18, 2007 the defendant sent to plaintiff a confirmatory document, confirming defendant's agreement to purchase the merchandise referred to in Paragraph 50 above. Said confirmatory document is identified as defendant's "EDI Blanket Order No. 4719904" (hereinafter referred to as "Order 4719904").

53.    On or about October 24, 2007 the defendant sent to plaintiff a revised EDI Blanket Order No. 4719904, changing the date for shipment of the merchandise covered by Order 4719904.

54.    The merchandise covered by Order 4719904 was ultimately scheduled to be shipped to defendant at the end of May 2008.

55.    The plaintiff, in accordance with its agreement with defendant to produce, sell and ship the merchandise covered by Order 4719904, did in fact produce said merchandise.

56.    The plaintiff has been ready, willing and able to deliver the merchandise covered by Order 4719904 in accordance with the agreement with defendant.

57.    However, on or about May 9, 2008 the defendant unilaterally canceled Order 4719904 without prior notice; without justification; and contrary to the agreement between plaintiff and defendant.

58.    As a consequence of defendant's breach of its agreement to take in and pay for the merchandise covered by Order 4719904, the plaintiff has sustained damages in the minimum sum of $263,782.00.

## ORDER 4848493:

59.    In and around December 14, 2007, the defendant ordered from plaintiff, and the plaintiff agreed to sell to defendant, ladies' tank tops and Bermuda shorts, for the total sum and agreed price of $383,688.00.

60.    On or about December 18, 2007 the defendant sent to plaintiff a confirmatory document, confirming defendant's agreement to purchase the merchandise referred to in Paragraph 59 above.  Said confirmatory document is identified as defendant's "EDI Blanket Order No. 4848493" (hereinafter referred to as "Order 4848493").

61.    The merchandise covered by Order 4848493 was ultimately scheduled to be shipped to defendant at the end of May 2008.

62.    The plaintiff, in accordance with its agreement with defendant to produce, sell and ship the merchandise covered by Order 4848493, did in fact produce said merchandise.

63.    The plaintiff has been ready, willing and able to deliver the merchandise covered by Order 4848493 in accordance with the agreement with defendant.

64.    However, on or about May 9, 2008 the defendant unilaterally canceled Order 4848493 without prior notice; without justification; and contrary to the agreement between plaintiff and defendant.

65.    As a consequence of defendant's breach of its agreement to take in and pay for the merchandise covered by Order 4848493, the plaintiff has sustained damages in the minimum sum of $383,688.00.

**ORDER 4848497:**

66.    In and around December 14, 2007, the defendant ordered from plaintiff, and the plaintiff agreed to sell to defendant, ladies' tank tops and Bermuda shorts, for the total sum and agreed price of $3,456.00.

67.    On or about December 18, 2007 the defendant sent to plaintiff a confirmatory document, confirming defendant's agreement to purchase the merchandise referred to in Paragraph 66 above.  Said confirmatory document is identified as defendant's "EDI Stand-Alone Order No. 4848497" (hereinafter referred to as "Order 4848497").

68.    The merchandise covered by Order 4848497 was ultimately scheduled to be shipped to defendant at the end of May 2008.

69.    The plaintiff, in accordance with its agreement with defendant to produce, sell and ship the merchandise covered by Order 4848497, did in fact produce said merchandise.

70.    The plaintiff has been ready, willing and able to deliver the merchandise covered by Order 4848497 in accordance with the agreement with defendant.

71.    However, on or about May 9, 2008 the defendant unilaterally canceled Order 4848497 without prior notice; without justification; and contrary to the agreement between plaintiff and defendant.

72.    As a consequence of defendant's breach of its agreement to take in and pay for the merchandise covered by Order 4848497, the plaintiff has sustained damages in the minimum sum of $3,456.00.

**ORDER 4875479:**

73.    In and around December 2007, the defendant ordered from plaintiff, and the plaintiff agreed to sell to defendant, ladies' tee tops and Bermuda shorts, for the total sum and agreed price of $479,749.50.

74.    On or about February 8, 2008 the defendant sent to plaintiff a confirmatory document, confirming defendant's agreement to purchase the merchandise referred to in Paragraph 73 above.  Said confirmatory document is identified as defendant's "EDI Blanket Order No. 4875479" (hereinafter referred to as "Order 4875479").

75.    The plaintiff, in accordance with its agreement with defendant to produce, sell and ship the merchandise covered by Order 4875479, did in fact produce said merchandise.

76.    On or about April 29, 2008 the defendant sent to plaintiff its "EDI Release or Delivery Order", authorizing the delivery of the merchandise covered by Order 4875479.

77.    In accordance with defendant's instructions, the plaintiff arranged for delivery of the merchandise covered by Order 4875479, through the defendant's designated trucker.

78.    The defendant, however, only took in $343,404.00 of the merchandise covered by Order 4875479.

79.    The defendant has refused to take in the balance of the merchandise covered by Order 4875479, and the defendant, on or about May 9, 2008, sought to cancel said order, without prior notice, or justification and contrary to the agreement with plaintiff.

80.    The plaintiff has been ready, willing and able to deliver the balance of the merchandise covered by Order 4875479 in accordance with the agreement with defendant.

81.    As a consequence of defendant's breach of its agreement to take in and pay for all of the merchandise covered by Order 4875479, the plaintiff has sustained damages in the minimum sum of $136,345.50.

82.    In addition to breaching its agreements with plaintiff to take in the merchandise referred to in this cause of action, the defendant also breached its covenant of good faith and fair dealing.

83.    As a consequence of defendant's breach of its agreements and covenant of good faith and fair dealing, the plaintiff has sustained damages in the minimum sum of $1,004,609.50.

## NINTH CAUSE OF ACTION -IMPROPER MARGIN
## ASSISTANCE, CHARGEBACKS, DEDUCTIONS,
## RETURNS AND CANCELLATIONS:
## BREACH OF CONTRACT

84.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 83 as though more fully set forth herein.

85.    During the year 2006, the plaintiff shipped to defendant approximately $7.5 million of ladies' activewear garments.

86.    During the year 2007, the plaintiff shipped to defendant approximately $10.4 million of ladies' activewear garments.

87.    In and around April 2006, the plaintiff and defendant entered into a written "Vendor Support Agreement". Among other things, the Vendor Support Agreement provides for "Profitability Assistance" (also known as "margin support" or "margin assistance") to Kohl's to offset Kohl's purported markdowns or advertising of plaintiff's products. Said Agreement provided that the minimum assistance to Kohl's would equal 2.5% of gross receipts from the vendor, and that any "additional support may be negotiated".

88.    There is no requirement that plaintiff provide any purported profitability assistance or margin support to Kohl's in excess of 2.5% of gross receipts.

89.    Kohl's induced the plaintiff to sign the Vendor Support Agreement (hereinafter referred to as the "VSA"), calling for a 2.5% margin assistance, with the undisclosed intent that

it -- Kohl's -- would in fact require plaintiff to provide significantly higher margin assistance in order for Kohl's to obtain as much as a 43% gross margin on its own sales.

90.    Kohl's did not advise the plaintiff of defendant's intent to require margin assistance that would enable Kohl's to obtain as much as a 43% gross margin, at the time plaintiff signed the VSA.

91.    Plaintiff relied upon the 2.5% provision in the VSA, and did business with Kohl's based, at least in part, on the 2.5% provision in the VSA.

92.    Plaintiff would not have done business with Kohl's if plaintiff had known that defendant would demand and require plaintiff to provide margin assistance well in excess of the 2.5%.

93.    Kohl's induced plaintiff to do business with Kohl's, and Kohl's continued to increase its orders with plaintiff, with the undisclosed intent of requiring the plaintiff to provide margin assistance to defendant in order for Kohl's to obtain up to a 43% gross margin, contrary to the VSA.

94.    Because of the extreme disparity in economic and bargaining power between the defendant and the plaintiff, the defendant has been able to coerce plaintiff, as well as many other vendors in the industry, into not challenging the improper margin assistance practice, or in acquiescing in said practice, whether or not the margin assistance was proper, all to the serious detriment of plaintiff and other vendors.

95.    In addition, upon information and belief, the defendant has a policy of intentionally over-ordering merchandise from vendors, including the plaintiff, with the intent of

either returning excess merchandise; canceling orders; and/or compelling vendors to give money to the defendant in order to make up the purported profit margin desired by defendant.

96.    Upon further information and belief, because the defendant is a public corporation, its reported sales to the public and to the investment community, are a significant part of its business.    Consequently, the defendant seeks to report ever-increasing sales, and the defendant has adopted a plan and strategy to push sales volume, even at the cost of its gross margin, by aggressively promoting special sales prices, and promoting aggressive markdowns of its merchandise to lure the consumer into buying the merchandise.

97.    As part of this plan and policy, the defendant intentionally over-orders merchandise from its vendors, including the plaintiff, without advising such vendors that Kohl's was intentionally over-ordering the merchandise.    By having excessive merchandise available, Kohl's can accomplish its purpose of aggressively selling it at discounted prices, even if Kohl's' gross margin number suffers as a result of the promotional pricing.

98.    In addition, Kohl's' undisclosed policy and intent is that if, by virtue of the over-ordering of merchandise and the promotional pricing, its gross margin does in fact suffer, then Kohl's will demand margin assistance from the vendors – whether by deducting monies from open invoices, or returning merchandise, or canceling future orders -- as it has done with plaintiff, even though there is no requirement that the vendors provide such additional margin assistance.    However, in the event the vendors do not provide the requested margin assistance to Kohl's, Kohl's threatens to cease further business with the vendor, as it did with plaintiff.

99.    Hence, Kohl's thereby seeks to report to Wall Street, and to the public, that its sales are increasing, and that (by virtue of it coercing vendors to provide the requested margin assistance), Kohl's is also meeting its gross margin projections.    The truth, however, is that

Kohl's is artificially increasing its sales, and artificially reaching its gross margin numbers, through its fraudulent and improper demands upon its vendors, including the plaintiff.

100.    Kohl's' policy and intent to over-order merchandise from plaintiff, with the further intent to either return excess merchandise; cancel orders; and/or compel the plaintiff to give money to the defendant in order to make up the purported profit margin desired by defendant, was not divulged to plaintiff at the time the defendant issued orders to, and agreed to purchase merchandise from, the plaintiff.

101.    The plaintiff proceeded with the manufacture and production and shipment of the merchandise ordered by Kohl's, expecting to be properly paid for said merchandise.

102.    During 2007 and into 2008, the defendant, primarily through its Buyer, Assistant Buyer and Divisional Merchandise Manager – Julie Silhol, Andrea Kohler and Stephen Binkley, respectively – compelled the plaintiff to give the defendant inflated and improper margin support in order to maintain the parties' business relationship and ongoing contracts.  In addition to deducting huge sums of monies from outstanding invoices of the plaintiff (called chargebacks or deductions), the defendant also induced the plaintiff to accept huge returns of merchandise, with the promises of significant ongoing business in the future.

103.    The chargebacks, deductions and returns of merchandise during 2007 and 2008 have totaled in excess of $3.0 million, and have greatly exceeded the agreed 2.5%.

104.    The defendant deducted these improper chargebacks and margin support from outstanding invoices of the plaintiff, thereby improperly withholding payments from plaintiff.

105.    In fact, the defendant continuously required plaintiff to provide margin support well in excess of the 2.5% by requiring plaintiff to authorize deductions from invoices; cancellations of orders; and/or returns of merchandise. In seeking said margin support, the defendant, through its employees Julie Silhol, Andrea Kohler and Stephen Binkley, repeatedly advised plaintiff that plaintiff was defendant's "partner", and as such, plaintiff was compelled to provide the requested assistance. And in furtherance of defendant's appeal to plaintiff as its "partner", the defendant, through Silhol, Kohler, and Binkley, represented to plaintiff that without the requested margin support, the plaintiff would no longer be a vendor to the defendant.

106.    The defendant, consequently, induced, coerced and compelled the plaintiff to provide excessive and improper margin support by advising the plaintiff that it would continue to be a "partner" with defendant, and a vendor to defendant, for subsequent seasons and years, if and only if plaintiff cooperated with defendant. Indeed, on August 3, 2007 Kohler advised plaintiff's employee, Steven Cohn, that "You and your team are great partners, and we thank you for your continued support."

107.    In addition, in and around the end of July 2007, at the Kohl's offices in Milwaukee, Wisconsin, in meetings and discussions between employees of plaintiff – Mark Wiesner and Steven Cohn – and Andrea Kohler of Kohl's, and in subsequent discussions between them into August 2007, Ms. Kohler indicated that if plaintiff provided the margin assistance sought by Kohl's at that time, then the orders of defendant for Spring 2008 merchandise would increase by approximately 8%, and plaintiff's merchandise would be in an additional 100 stores over and beyond those in 2007. In addition, Ms. Kohler also discussed further orders for plaintiff for a table tower display for Spring 2008, which would significantly increase the business between plaintiff and Kohl's for 2008, if plaintiff provided the margin assistance.

108.    The plaintiff would not have provided said margin assistance, or taken back merchandise from defendant in 2007, without the defendant's representations that plaintiff was a partner and that defendant would increase the business with plaintiff for Spring 2008 and beyond.

109.    Further, in a follow-up meeting at the Kohl's offices in Milwaukee on August 22, 2007, between – for plaintiff, its Executive Vice President, Ms. Jing Deng, and Mark Wiesner and Steve Cohn – and for defendant, Andrea Kohler and Vanessa Ruminsky, the defendant induced, coerced and compelled the plaintiff to allow a return of hundreds of thousands of dollars of merchandise; cancellation of a large order that was due to, and available to be, shipped to defendant in August, as well as allowing deductions of over $300,000 from invoices, with assurances to plaintiff, once again, that plaintiff was a great partner; that defendant recognized plaintiff's commitment to defendant; and that defendant was committed to plaintiff.

110.    Thereafter, in late August 2007, the defendant, through Ms. Kohler, indicated to plaintiff that Kohl's expected to do at least $10 million in business with plaintiff during 2008.

111.    The plaintiff did in fact take back hundreds of thousands of dollars in merchandise, allowed the cancellation of the order, and allowed the deduction of over $300,000 from invoices by defendant, based upon defendant's aforesaid representations and assurances to plaintiff. In addition, without such representations and assurances, the plaintiff would not have allowed said returns, cancellation or deduction.

112.    Thereafter, in December 2007 and January 2008, Kohl's sought an additional $1,019,000 in margin support from plaintiff for 2007.

113.    Numerous discussions and correspondence were held and transmitted between plaintiff - by Deng, Wiesner and Cohn – and defendant – by Silhol, Kohler and Binkley.  In fact, on January 29, 2008 Kohler wrote to plaintiff:

> "I know you are working diligently on our Fall 2007 margin need of $1,019,000. We are, as I'm sure you are aware, in a very difficult situation ourselves and really need you to be able to come to us with the full need.  We definitely value your partnership and everything you have done for us this year.  Our situation is one of great need across the board, and we are asking all of our partners to come to the table in full, as pressure is definitely upon us to hit our margin plans."

114.    Nonetheless, the plaintiff did not agree to give the defendant the $1,019,000 in margin assistance.

115.    However, without any right or agreement by plaintiff, the defendant improperly deducted the sum of $1,028,000 from open invoices of plaintiff, on or about February 6, 2008.

116.    The plaintiff never agreed to defendant's deduction of the $1,028,000.

117.    In addition, the defendant, during the first half of 2008, sought additional margin assistance of over $400,000 from plaintiff.  Once again the plaintiff refused to acquiesce.

118.    In response to the plaintiff's objections to the deduction of $1,028,000 and the additional request of over $400,000, the defendant unilaterally and improperly cancelled outstanding orders with plaintiff, and has failed to remit payment of over $300,000 (and shortly to be over $800,000) for invoices that are past due.

119.    In addition, contrary to defendant's representations and assurances during 2007 and into 2008, the defendant failed to give to plaintiff the additional business promised for Spring or Fall 2008.

120.    Hence, the threats of defendant to cease business with plaintiff if it did not cooperate with defendant's repeated and improper requests for margin support, were in fact borne out by the defendant's improper cancellations of orders, withholding of payments, and cessation of business.

121.    The defendant obviously intended to cease doing business with plaintiff if plaintiff did not agree to the excessive and improper chargebacks, deductions, cancellations and returns in 2007 and 2008, and defendant had promised plaintiff future business in order to take advantage of plaintiff and reap the unilateral benefits of the chargebacks, deductions, etc.

122.    Defendant had a clear motive to commit fraud against the plaintiff and make false representations at the time of the meetings, discussions and communications referred to above, in that defendant stood to gain large sums of money from plaintiff if plaintiff believed and relied upon defendant's false representations, and accommodated the requested chargebacks, deductions, etc.

123.    Additionally, upon information and belief, senior executives of the defendant receive bonuses and/or incentives based upon the defendant's performance, and they therefore place inordinate pressure upon defendant's employees – such as Silhol and Kohler – to hit their arbitrary margin plans.

124.    Upon further information and belief, the practice of the defendant in issuing improper chargebacks, deductions and margin assistance allowances to plaintiff and to other

vendors in the industry inflated the defendant's financial performance and thereby benefitted those senior executives whose bonuses and incentives were based upon the defendant's financial performance.

125.    Said senior executives therefore had personal financial motives and incentives to encourage the defendant and its appropriate employees to issue improper and excessive chargebacks, cancellations and returns to the plaintiff and other vendors.

126.    In addition, by virtue of the great disparity in economic and bargaining power between plaintiff and defendant, the defendant had the clear opportunity and ability to commit fraud against plaintiff, since as a small supplier to defendant, defendant's original increase in its orders to plaintiff caused plaintiff's business to heavily rely upon defendant, and to therefore also rely upon defendant's representations.  The defendant thereby used its economic size and strength to coerce plaintiff to accommodate defendant's requests for margin assistance.

127.    Furthermore, upon information and belief, in and around November 2007, the defendant entered into a multi-year, exclusive license to sell merchandise in defendant's stores under the name "Fila".

128.    Upon information and belief, the defendant negotiated the exclusive license with Fila during at least the second and third quarters of 2007.

129.    Based upon the license with Fila, the defendant intended to reduce its volume of business - for the years 2008 and beyond - with other activewear vendors that it had been doing business with during 2007, and to replace that business with business from Fila.  In fact, Kohl's President, Kevin Mansell, was quoted as saying that Kohl's would maintain its Nike and Addidas

products at their current levels, but Kohl's would "cut back on some other sports brands to make room" for Fila on its shelves.

130.    Unbeknownst to plaintiff, and contrary to the representations given to plaintiff, one of the vendors that defendant intended to reduce its business with during 2008 was the plaintiff.

131.    However, the intent to reduce its business with plaintiff was known by the defendant during at least the second, third and fourth quarters of 2007, as well as in 2008. This intent was known by Steven Binkley, Julie Silhol and Andrea Kohler, and at the time the defendant, through these employees, made the representations to plaintiff from August 2007 into 2008 regarding giving plaintiff substantial future business, the defendant had the undisclosed intention of not performing its representations and assurances.

132.    In fact, the defendant did not advise the plaintiff that, because of the exclusive license agreement with Fila and the consequent business defendant would do with Fila, the defendant intended to reduce its ongoing business with defendant. To the contrary, as noted above, the defendant was still assuring plaintiff of its "partnership" with Kohl's and future business with Kohl's at the time Kohl's was seeking to obtain $1,019,000 from plaintiff in January 2008, and the only reason that the defendant was providing these false assurances and representations to plaintiff was in order to induce plaintiff to continue to provide excessive and improper margin assistance to defendant.

133.    The representations made by defendant to plaintiff as detailed above, and the concealment by defendant of necessary and material facts and information from the plaintiff regarding defendant's intent to continue to do business with plaintiff and to increase said business for 2008, were false when made; were made by defendant's representatives with

knowledge of their falsity and with the intent to have plaintiff rely on said false representations in order to induce plaintiff to provide all margin assistance requested by defendant for 2007 and 2008; the plaintiff did in fact rely upon the defendant's false representations and the defendant's concealment of material facts; and the margin assistance that plaintiff did in fact provide was done so in reliance upon said false representations, all to plaintiff's severe damage.

134.    Had plaintiff known defendant's true intent, plaintiff would not have granted the margin assistance that it did during 2007, nor would plaintiff have taken back merchandise from defendant, or allowed cancellations during 2007. However, in reliance upon the defendant's false representations, the plaintiff did take back merchandise, allow cancellations and allow certain deductions in 2007, all to plaintiff's serious detriment and loss.

135.    The chargebacks, deductions, returns, allowances and cancellations by defendant during 2007 and 2008 violated defendant's agreements with plaintiff, and violated defendant's covenant of good faith and fair dealing.

136.    By virtue of the defendant's breach of its agreements with plaintiff, including the Vendor Support Agreement, as well as its breach of the covenant of good faith and fair dealing, the plaintiff has been damaged in a sum to be determined at trial, but believed to exceed $3,000,000.00.

## TENTH CAUSE OF ACTION -IMPROPER MARGIN
## ASSISTANCE, CHARGEBACKS, DEDUCTIONS, RETURNS
## AND CANCELLATIONS:
## RESTITUTION

137.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 136 as though more fully set forth herein.

138.    By virtue of the defendant's wrongful actions set forth herein, it has received and/or retained monies to which it is not entitled.

139.    As a consequence thereof, the plaintiff has been damaged in a sum to be determined at trial but believed to exceed $3,000,000.00.

## ELEVENTH CAUSE OF ACTION -IMPROPER MARGIN
## ASSISTANCE, CHARGEBACKS, DEDUCTIONS, RETURNS
## AND CANCELLATIONS:
## FRAUD

140.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 139 as though more fully set forth herein.

141.    The defendant's misrepresentations and concealment of material facts, as set forth above, were done with the knowledge of their falsity and with knowledge of the concealment of material facts, and with the intent of having the plaintiff rely on said representations and concealment, to its detriment.

142.    The plaintiff did in fact rely on the false representations and concealment of the defendant, to its significant damage.

143.    As a consequence thereof, the defendant has committed fraud against the plaintiff, as well as against the public.

144.    As a further consequence thereof, the plaintiff has been damaged in a sum to be determined at trial but believed to exceed $3,000,000.00.

## TWELFTH CAUSE OF ACTION -IMPROPER MARGIN ASSISTANCE, CHARGEBACKS, DEDUCTIONS, RETURNS AND CANCELLATIONS: UNJUST ENRICHMENT

145.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 144 as though more fully set forth herein.

146.    By virtue of the defendant's improper actions set forth above, it has been unjustly enriched.

147.    As a consequence thereof, the plaintiff has sustained damages in an amount to be determined at trial, but believed to exceed $3,000,000.00.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff hereby demands trial by jury of all issues triable of right by jury.

**WHEREFORE**, plaintiff respectfully demands judgment against the defendant, as follows:

a.   On the first cause of action, the sum of $306,872.64;

b.   On the second cause of action, the sum of $306,872.64;

c.   On the third cause of action, the sum of $306,872.64;

d.   On the fourth cause of action, the sum of $306,872.64;

e.   On the fifth cause of action, the sum of $521,336.16;

f.   On the sixth cause of action, the sum of $521,336.16;

g.   On the seventh cause of action, the sum of $521,336.16;

h.   On the eighth cause of action, a sum to be determined at trial, but believed to exceed $1,004,609.50;

i.   On the ninth cause of action, a sum to be determined at trial, but believed to exceed $3,000,000.00;

j.    On the tenth cause of action, a sum to be determined at trial, but believed to exceed $3,000,000.00;

k.    On the eleventh cause of action, a sum to be determined at trial, but believed to exceed $3,000,000.00;

l.    On the twelfth cause of action, a sum to be determined at trial, but believed to exceed $3,000,000.00;

m.    Plus interest, plaintiff's costs, disbursements and attorneys' fees incurred in the prosecution of the within action, and such other and further relief as this Court shall deem just and proper.

Dated: New York, New York
June 4, 2008

SCHLACTER & ASSOCIATES
Attorneys for Plaintiff
450 Seventh Avenue
New York, New York 10123
(212) 695-2000

By: Jed R. Schlacter (JRS 4874)