UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
FU DA INTERNATIONAL, LTD.,                          Docket No.: 08 CV 5164

                            Plaintiff,
                                                    NOTICE OF MOTION

            -against-

KOHLS DEPARTMENT STORES, INC.,

                            Defendant,
-------------------------------------------------------------------X

MOTION BY:              STEVEN F. GOLDSTEIN, LLP, Attorneys for Defendants,
                        KOHL'S DEPARTMENT STORES, INC., One Old Country
                        Road, Suite 318, Carle Place, New York 11514
                        (516) 873-0011

DATE, TIME & PLACE:     Motion made before the Honorable Judge Baer of the United
                        States District Court, Southern District of New York, at the
                        Courthouse located at 500 Pearl Street, New York, NY
                        10007-1312.

SUPPORTING PAPERS:      Affirmation of Steven F. Goldstein, amended Memorandum of
                        Law, and attached Exhibits

RELIEF REQUESTED:       (A) In Support of the within Motion for an Order dismissing this
                        matter, pursuant to FRCP 12(b)(1), 12(b)(3), and/or 12(b)(6), as
                        bringing this case is the State of New York is in violation of the
                        Forum Selection Clause entered into by both parties to this
                        matter; and

                        (B) For an Order dismissing this matter, pursuant to 28 U.S.C.
                        1406(a), as this matter was brought in an improper venue; and

                        (C) For such other, further and different relief as this Court may
                        deem just and proper.

ANSWERING PAPERS:    Answering affidavits to be served pursuant to the Federal Rules.

Dated: Carle Place, New York
       July 8, 2008

                    STEVEN F. GOLDSTEIN, L.L.P.

                    By:_____
                    STEVEN F. GOLDSTEIN (2076)
                    Of Counsel:
                    CHRISTOPHER R. INVIDIATA (1140)
                    Attorneys for Defendant
                    KOHL'S DEPARTMENT STORES, INC.
                    One Old Country Road, Suite 318
                    Carle Place, New York  11514
                    (516) 873-0011

TO:    SCHLACTER & ASSOCIATES
       Attorneys for Plaintiff
       450 Seventh Avenue
       New York, NY 10123
       (212) 695-2000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
FU DA INTERNATIONAL, LTD.,                               Docket No.: 08 CV 5164

                           Plaintiff,

                                                         AFFIRMATION
          -against-                                      IN SUPPORT

KOHLS DEPARTMENT STORES, INC.,

                           Defendant,
-------------------------------------------------------------------X


          STEVEN F. GOLDSTEIN, an attorney duly admitted to practice before the Courts of

the State of New York, hereby affirms the following to be true under the penalties of perjury:

          1.       This affirmation is offered in support of the within motion seeking to dismiss the

plaintiff's complaint on the ground that it violates the Forum Selection Clause in operation

between the parties to this matter at all applicable times, pursuant to F.R.C.P. 12(b) (1),

12(b)(3) and 12(b)(6), as well as 28 U.S.C. 1406(a).

## PROCEDURAL HISTORY

          2.       The action was commenced in the United States District Court, Southern District

of New York, by service of a Complaint on or About June 4, 2008. The parties have stipulated

to extend "the defendant's time within which to respond to plaintiff's complaint" to July 14,

2008. The plaintiff's Complaint, together with the so-ordered stipulation are annexed hereto

collectively as Exhibit "A."

          3.       This matter relates to two separate contract documents, both signed by the

plaintiff in this matter, and both relating to the same series of business transactions regarding

which the plaintiff now brings the present litigation. The first is a Vendor Support Agreement,

which states that it is subject to terms and conditions listed on the Kohl's website, and incorporates them by reference. The Vendor Support Agreement and the Merchandise Purchase Order Terms and Conditions referenced and incorporated therein are collectively annexed hereto as Exhibit "B." The second document is a Kohl's Department Store Electronic Data Interchange Trading Partner Agreement, a copy of which is annexed hereto as Exhibit "C." The Trading Partner Agreement governs Kohl's business relationships with any and all entities with whom Kohl's does business, who seek as a part of their business transactions to transfer data electronically to and from Kohls. It also incorporates by reference the Kohl's Vendor Support Agreement and the Merchandise Purchase Order Terms and Agreements contained on the Kohl's website (Please see the "Recitals" paragraph on the first page of Exhibit "C").

4.      Both documents are signed by and agreed to by individuals who are noted as being executive vice presidents of Fu Da International (Please see Exhibits "B" and "C").

## BACKGROUND AND INTRODUCTION

5.      Kohl's has been doing business with Fu Da International since 1998. Various written agreements were signed by the parties addressing payment terms, discounts, defective allowances and profitability assistance. These written agreements are commonplace in the retail industry, and address the responsibilities of the vendor with respect to the vendor's various product offerings.

6.      In that regard, Fu Da and Kohl's jointly agreed throughout the relationship to various product sales levels based on anticipated performance of Fu Da's products for each selling season. The sales performance was then continuously monitored by Fu Da and Kohl's on a weekly basis to understand the overall profitability of the program, and then to address any

2

relative need by the vendor to provide profitability assistance in light of sales performance, all in accordance with their written agreements.

7.    The plaintiff's complaint alleges that following causes of action:

        a        Breach of contract

        b        Account Stated

        c        Unjust Enrichment

        d        Quantum Meruit

        e        Anticipatory Breach

        f        Restitution

8.    The gravamen of the complaint is that pursuant to an agreement with Kohl's, the plaintiff sold and delivered goods to Kohl's in April and May of 2008, and that Kohl's has failed to pay for those goods.  Plaintiff further alleges that Kohl's unjustly and improperly cancelled orders, and unfairly and coercively induced the plaintiff to enter into an agreement to its detriment. (See Exhibit "A.")

9.    The defendant seeks a dismissal of the complaint in this matter, pursuant to F.R.C.P. 12(b) (1), 12(b)(3) and 12(b)(6), as well as 28 U.S.C. 1406(a).

10.    Kohl's has been doing business with Fu Da International since May 5, 1998.  Various written agreements were signed by the parties addressing payment terms, discounts, defective allowances and profitability assistance.  These written agreements are commonplace in the retail industry, and address the responsibilities of the vendor with respect to the vendor's various product offerings.

11.    In that regard, Fu Da and Kohl's jointly agreed throughout the relationship to

various product sales levels based on anticipated performance of Fu Da's products for each

selling season. The sales performance was then continuously monitored by Fu Da and Kohl's

on a weekly basis to understand the overall profitability of the program, and then to address any

relative need by the vendor to provide profitability assistance in light of sales performance, all

in accordance with their written agreements.

     12.    The Merchandise Purchase Order Terms and Conditions agreed to by the

plaintiff - and in effect at all times relevant to this matter - contains, in the paragraph entitled

"Miscellaneous" thereof (Exhibit "B," p. 13 - 14), the following provision:

> Any suit, action or proceeding against us with respect to our Purchase Order or the
> parties' relationship or actions with respect thereto shall be brought in Waukesha
> County, Wisconsin, or in the United States District Court for the Eastern District
> of Wisconsin, and you hereby submit to the exclusive jurisdiction or such courts for
> the purpose of any suit, action or proceeding. You waive any claim that any such
> suit, action or proceeding brought in any such court has been brought in an
> inconvenient forum.

     13.    The Kohl's Department Store Electronic Data Interchange Trading Partner

Agreement ("Trading Partner Agreement") contains the following provision, at Section 4.4

thereof:

> 4.4 Governing Law. This Agreement shall be governed by the interpreted in
> accordance with the laws of the State of Wisconsin and exclusive jurisdiction of
> any dispute, claim or lawsuit arising from the agreement shall be in Waukesha
> County, Wisconsin."

Note as well that the Trading Partner Agreement incorporates by reference the Terms and

Conditions listed on the Kohl's website, and thus it in fact contains both of the above clauses.

(Please see the "Recitals" paragraph on the first page of Exhibit "C").

     14.    It is respectfully asserted herein that the above two forum selection clauses

mandate that this matter be brought and heard in either the State or Federal courts in Waukesha County, Wisconsin.  While the Federal Courts in the State of New York may differ on the specific technical grounds by which they will dismiss an action for breach of a forum selection clause, they all agree that such dismissal is proper.

15.    The plaintiff's claims in this matter all relate entirely to the business relationship between these two parties which was created in its entirety by these two documents. Fu Da International is a sophisticated business entity which does business on both a national and international basis. Plaintiffs could have as easily brought this matter in Wisconsin as in New York. Plaintiffs freely entered into agreements with Kohls, and they must honor the forum-selection clauses contained therein. It is thus respectfully asserted that this matter must be dismissed in its entirety.

16.    We hereby refer the Court to the enclosed Memorandum of Law for our full discussion and analysis of the legal issues in this matter. However, in summary, it can not be denied that the causes of action brought by the plaintiff in this matter all relate to and arise out of agreements between the parties wherein the plaintiff expressly agreed that the State and Federal Courts of Wisconsin would have *sole* jurisdiction over these matters. The forum selection clauses operative here are enforceable in all respects, and there is no basis by which the plaintiff can reasonably alleged otherwise.

**WHEREFORE**, it is respectfully requested that this Court issue an Order, pursuant to F.R.C.P. 12(b) (1), 12(b)(3), 12(b)(6), and/or 28 U.S.C. 1406(a) dismissing this matter in its entirety as being improperly brought in this Court, together with such other, further and different relief as this Court deems just and proper.

Dated: July 14, 2008
      Carle Place, New York

                                         _____
                                         STEVEN F. GOLDSTEIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
FU DA INTERNATIONAL, LTD.,                    Docket No.: 08 CV 5164

                          Plaintiff,

          -against-

KOHLS DEPARTMENT STORES, INC.,

                          Defendant,
------------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S PRE-ANSWER MOTION TO DISMISS


Dated: Carle Place, New York
       July 8, 2008

                              STEVEN F. GOLDSTEIN, L.L.P.
                              Attorneys for Defendant
                              KOHL'S DEPARTMENT STORES, INC.
                              One Old Country Road, Suite 318
                              Carle Place, New York  11514
                              (516) 873-0011


Of Counsel

STEVEN F. GOLDSTEIN (2076)
CHRISTOPHER R. INVIDIATA (1140)

**POINT**
**Standards for the interpretation and enforcement of forum selection Clauses**

In New York, an unambiguous contract is interpreted in accordance with the plain meaning of the words and phrases therein; This of course includes the terms of a forum selection clause, which must be enforced if it is unambiguous and its enforcement would not be unreasonable or unjust.. *Creditek LLC v. North General Hospital*, No. 07 Civ. 9322 (DLC), 2008 WL 394805, *1 (SDNY, 2008); citing *Jones v. Weibrecht*, 901 F.2d 17, 18 (2d Cir., 1990) and *D.H. Blair & Co, Inc. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir., 2006). The Federal Courts will generally try and avoid an interpretation of a contract which renders one of its terms or clauses meaningless. *Shaw Group v. Triplefien Int'l Corp.*, 322 F.3d 115, 124 (2d Cir., 2003).

The Second Circuit Court of Appeals, in the 2007 case of *Phillips v. Audio Active Limited*, 494 F.3d 378 (2nd Cir., 2007), in response to a Rule 12(b)(3) motion to dismiss for improper venue, set the standard by which the enforceability of forum selection clauses is to be determined:

> Determining whether to dismiss a claim based on a forum selection clause involves a four-part analysis. The first inquiry is whether the clause was reasonably communicated to the party resisting enforcement. ... The second step requires us to classify the cause as mandatory or permissive, i.e. to decide whether parties are *required* to bring any dispute to the designated forum or simply *permitted* to do so. ... Part three asks whether the claims and parties involved in the suit are subject to the forum selection clause. ...

> If the forum clause was communicated to the resisting party, has mandatory force, and covers the claims and parties involved in the dispute, it is presumptively enforceable... The fourth, and final, step is to ascertain whether the resisting party has rebutted the presumption of enforceability by making a sufficient showing that "enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching."

*Phillips*, 494 F.3d at 383, internal citations omitted.

-2-

The Second Circuit in *Asoma Corporation v. SK Shipping Co., Ltd.*, 467 F.3d 817 (2nd Cir., 2006), a matter relating to a forum selection clause in a bill of lading, noted that "[t]he Supreme Court has not specifically designated a single clause of Rule 12(b) as the 'proper procedural mechanism to request dismissal of a suit based upon a valid forum selection clause,' nor have we." *Asoma Corporation*, 467 F.3d at 822. The Court went on to state that the "burden [is] on the plaintiff, who brought suit in a forum other than the one designated in the forum selection clause, to make a 'strong showing' in order to overcome the presumption of enforceability." *Id*, citing *New Moon Shipping Co., Ltd. v. MAN B & W Diesel, AG*, 121 F.3d 24, 28 (2nd Cir., 1997).

Less than a month ago, the Honorable Judge Sidney Stein of the District Court of the United States, Southern District of New York, issued a decision which consisted largely of an intensive examination of forum selection clauses in the Second Circuit, and of the *Phillips* standards relating to them. He noted that "[t]here is a split of authority in the Second Circuit regarding the appropriate procedural mechanism by which to enforce a forum selection clause," noting decisions granting motions made under 12(b)(1) for lack of subject matter jurisdiction, 12(b)(3) for improper venue, and 12(b)(6) for failure to state a claim. *Cfirstclass Corp. v. Silverjet PLC*, __ F.Supp.2d __, 2008 WL 2389811 (S.D.N.Y., June 11, 2008), citing *AVC Nederland BV v. Atrium Inv. Partnership*, 740 F.2d 148, 152 (2nd Cir., 1984); *Phillips*, infra; *Evolution Online Systems, Inv. v. Koninklijke PTT Nederland NV*, 145 F.3d 505, 508 (2nd Cir., 1998).

Judge Stein went on to apply the *Phillips* four part analysis. He found, first that the mere

-3-

fact that the plaintiff in that matter was a party to each of the contracts in question adequately demonstrates that the forum provisions therein were reasonably communicated thereto, satisfying the first of the four inquiries. *Cfirstclass*, 2008 WL 2389811 at \*3.

The court then reviewed the language of the provision, which stated that "disputes arising hereunder shall be submitted to the exclusive jurisdiction of the Courts of England and Wales." Judge Stein found that this language "plainly declaims 'the parties' intent to make jurisdiction exclusive,'" thus satisfying the second of the four inquiries. *Cfirstclass*, 2008 WL 2389811 at \*3.

Judge Stein noted as well that "the scope of a forum selection clause is not limited solely to claims for breach of the contract that contains it. ... Whether a forum selection clause encompasses other claims depends principally on how broadly the clauses are worded. " *Cfirstclass*, 2008 WL 2389811 at \*4, citing *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2nd Cir., 1993). He goes on to state that "a contractually-based forum selection clause will also encompass tort claims if the tort claims ultimately depend upon the existence of a contractual relationship between the parties, or if resolution of the claims relates to interpretation of the contract, or if the tort claims involve the same operative facts as a parallel claim for breach of contract." *Id*. He notes of course that at this time, the clause is "presumptively enforceable, and that the burden of proof shifts to the resisting party, who "may overcome this presumption by making a sufficiently strong showing that the clause is unenforceable for any of the reasons discussed by the Second Circuit in the *Phillips* case. *Id*, citing *Phillips*, supra.

We turn now specifically to the forum-selection clauses contained within the contracts entered into by the parties to this matter, in terms of the four-point *Phillips* analysis.

-4-

## POINT II

### The forum-selection clauses were communicated to the plaintiff

As noted above, representatives of the plaintiff in this matter signed two separate agreements relating to and creating the business relationship between Fu Da and Kohls, the Vendor Support Agreement and the Trading Partner Agreement.

The Vendor Support Agreement entered into by Fu Da explicitly incorporates by reference the Merchandise Purchasing Order Terms and Conditions found on the Kohl's website. As noted above, those terms include a simply, plainly and <u>broadly</u> stated forum selection clause, granting the State and Federal Courts in the State of Wisconsin "exclusive jurisdiction" over "[a]ny suit, action or proceeding against us with respect to our Purchase Order or the parties' relationship or actions with respect thereto." In signing the Vendor Support Agreement, which clearly and unambiguously states that any and all purchase orders entered into between these two parties were subject to those terms and conditions, the plaintiff has expressly and explicitly agreed thereto.

Additionally, the Trading Partner Agreement also entered into by the plaintiff, contains a differently-worded but equally broad forum selection clause. It states specifically that the Courts in Waukesha County, Wisconsin have "exclusive jurisdiction" over all disputes, claims or lawsuits arising out of that agreement.

As noted by Judge Stein, the mere fact that these clauses were present in the agreements which were expressly agreed to by the plaintiff, in writing, is itself sufficient evidence that they were adequately communicated to the plaintiff in this matter. *Cfirstclass*, 2008 WL 2389811 at

-5-

*3. Having entered into not one but <u>two separate agreements</u> with Kohl's, <u>both</u> of which contained broadly and clearly worded clauses vesting Wisconsin with the *exclusive* jurisdiction over these claims, the plaintiff can not now claim that the terms of those clauses were not adequately communicated to them.

## POINT III

### The clauses are mandatory rather than permissive.

Where the contract utilizes phrases such as "are to be brought in" in connection with the forum selection clause, the clause is clearly mandatory, rather than permissive; unlike phraseology such as "shall come within the jurisdiction of," which has been found to be permissive "because it dealt solely with jurisdiction *without indicating that such jurisdiction was exclusive*." *Phillips*, 494 F.3d at 386, emphasis added.

Both of the clauses in operation in this matter are clear that they not only vest the Wisconsin courts with jurisdiction over this matter, but that those courts "shall" have "exclusive" jurisdiction. This is clearly sufficient to establish the mandatory nature of the forum selection clauses. *See Phillips*, 494 F.3d at 386; *Cfirstclass*, 2008 WL 2389811 at *3.

## POINT IV

### The claims and parties are subject to the forum selection clauses herein.

As stated by Judge Stein, "a contractually-based forum selection clause will also encompass tort claims if the tort claims ultimately depend upon the existence of a contractual relationship between the parties, or if resolution of the claims relates to interpretation of the contract, or if the tort claims involve the same operative facts as a parallel claim for breach of

contract." *Cfirstclass*, 2008 WL 2389811 at *4, citing *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2nd Cir., 1993).

As noted above, the plaintiff in this matter claims breach of contract, and subsequently makes further claims all of which arise solely and entirely out of Kohl's alleged breach of contract. All of the claims in this matter relate to the sale of goods between the parties to this action, which sale was governed by the agreements entered into by the parties, and by the Terms and Conditions expressly agreed to by Fu Da. The plaintiff thus can not possibly claim that either Fu Da or the claims brought thereby are not subject to these clearly-stated contractual terms.

## POINT V

### Enforcement of the forum clauses is neither unreasonable nor unjust

As stated by the Second Circuit, "[i]f the forum clause was communicated to the resisting party, has mandatory force, and covers the claims and parties involved in the dispute, it is presumptively enforceable." *Phillips*, 494 F.3d at 383.

As the two active forum selection clauses operable in this matter were both communicated to the plaintiff here, had mandatory force, and clearly cover the parties and claims involved in this dispute, it is respectfully submitted that the clauses are enforceable, and Kohl's has thus made out a prima facie case of its entitlement to have this matter dismissed in its entirety, and the burden of proof now falls on the plaintiff to "rebut[] the presumption of enforceability by making a sufficient showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching."*Phillips*, 494 F.3d at 383.

While the burden of proof now belongs to the plaintiff to rebut the presumption of

enforceability, a few pre-emptive comments are called for here. It has been noted before in the

Southern District that the mere existence of a valid forum selection clause grants the chosen

forum personal jurisdiction over the parties to the agreement. *Interested London Underwriters*

*v. Kelly Global Logistics, Inc.*, No. 06 Civ. 5845 (PKL), 2008 WL 558038, FN.8 (S.D.N.Y.,

2008); citing *Koninklijke Philips Elecs. v. Digital Works, Inc.*, 358 F.Supp.2d 328, 332 (SDNY,

2005). Similarly, the mere fact that the parties to an agreement selected a specific forum in the

course of a contract in and of itself amounts to a concession by those parties that they are

capable of trying the matter in the forum selected. *Id*, at FN8; citing *Philips*, 494 F.3d 378, 393.

Fu Da International is an enormous, sophisticated business entity with international

holdings and concerns. They do business throughout the country and the world, and could as

easily prosecute an action in Wisconsin as they could in New York. As a sophisticated business

entity, dealing at arm's length, they openly and expressly agreed to try any actions relating to

their business relationship with Kohls in either the State or Federal Courts located in the State

of Wisconsin, and there can be no reasonable allegation that the forum selection clauses were

obtained by fraud or overreaching.

## CONCLUSIONS

The forum selection clauses in operation in this matter are valid and enforceable, and

mandate that all of the claims made by the plaintiff in this matter be brought in either Waukesha

County, Wisconsin, or in the United States District Court for the Eastern District of Wisconsin,

and state expressly that those courts have exclusive jurisdiction over these claims. As such, it is

respectfully requested that this Court issue an Order, pursuant to F.R.C.P. 12(b) (1), 12(b)(3),

12(b)(6), and/or 28 U.S.C. 1406(a) dismissing this matter in its entirety as being improperly

brought in this Court, together with such other, further and different relief as this Court deems

just and proper.

Dated: July 8, 2008
       Carle Place, New York

                            _____
                           STEVEN F. GOLDSTEIN (2076)

# EXHIBIT A

SCHLACTER & ASSOCIATES
Attorneys for Plaintiff
450 Seventh Avenue
New York, New York 10123
(212) 695-2000
By: JED R. SCHLACTER (JRS-4874)

## 08 CV 5164

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

FU DA INTERNATIONAL LTD.,                    :

                  Plaintiff,       :        08 Civ.

     - against -                               :        <u>COMPLAINT</u>

KOHL'S DEPARTMENT STORES, INC.,              :

               Defendant.       :

--------------------------------------------------------------X

      Plaintiff Fu Da International Ltd., by its attorneys,  Schlacter & Associates, as and for its

Complaint against the defendant, Kohl's Department Stores, Inc., alleges as follows:


### JURISDICTION AND VENUE


     1.     This action, as more fully stated below, is for, <u>inter alia,</u> breach of contracts,

breach of the implied covenant of good faith and fair dealing, fraud, restitution, quantum meruit

and unjust enrichment.


     2.     This Court has jurisdiction of this action pursuant to 28 U.S.C. Section 1332(a)(1)

because the amount in controversy exceeds $75,000.00 exclusive of interest and costs, and is

between citizens of different States.

3.      Venue is proper in this district under 28 U.S.C. Section 1391(a). Process properly issues from this Court pursuant to Rule 4 of the Federal Rules of Civil Procedure.

## THE PARTIES

4.      During all times relevant herein, plaintiff Fu Da International Ltd. ("Fu Da"), was and is a corporation organized, operating and existing under the laws of the State of New York, having its principal place of business at 525 Seventh Avenue, New York, NY 10018.

5.      During all relevant times herein, defendant Kohl's Department Stores, Inc. ("Kohl's"), was and is a corporation organized, operating and existing under the laws of the State of Delaware, with offices at N56 W17000 Ridgewood Drive, Menomonee Falls, Wisconsin 53051. Kohl's owns and operates large department stores throughout the United States, including in the New York metropolitan area, and purchased merchandise for retail stores from Fu Da.

## FIRST CAUSE OF ACTION: BREACH OF CONTRACT - GOODS SOLD AND DELIVERED (APRIL 2008 DELIVERY)

6.      In and around the period from April 1, 2008 through April 4 2008, at the specific instance and request of the defendant, the plaintiff shipped and delivered to defendant, ladies' garments, at the agreed price and reasonable value of $306,872.64 (hereinafter sometimes referred to as the "April 2008 Delivery").

7.      All of said garments were delivered to defendant; accepted by defendant without complaint or objection; and used by defendant.

2

8.    A detailed listing of the items purchased and received by defendant is as follows:

| Invoice Date | Invoice # | Agreed Price & Reasonable Value |
|---|---|---|
| 4/1/08 | 83467 | $  979.20 |
| 4/4/08 | 83481 | 38,082.24 |
| 4/4/08 | 83482 | 20,522.88 |
| 4/4/08 | 83483 | 70,084.80 |
| 4/4/08 | 83484 | 60,739.20 |
| 4/4/08 | 83485 | 74,914.56 |
| 4/4/08 | 83486 | 41,549.76 |
| **Total:** | | **$306,872.64** |

9.    The defendant has failed to pay for the April 2008 Delivery referred to in Paragraph 8 above, that was shipped, received by it, and accepted by it, although the plaintiff has made repeated demands for payment.

10.    As a result of the defendant's failure to pay to the plaintiff the sum of $306,872.64, it has breached its agreement with plaintiff.

11.    As a consequence thereof, the plaintiff has been damaged in the sum of $306,872.64.

### SECOND CAUSE OF ACTION - ACCOUNT STATED

### FOR GOODS SOLD AND DELIVERED (APRIL 2008 DELIVERY)

12.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 11 as though more fully set forth herein.

13.    In and around April 2008, the plaintiff delivered to the defendant invoices totaling $306,872.64 for goods sold and delivered to defendant (the April 2008 Delivery).

14.    The invoices were received and retained by the defendant without objection.

15.    As a consequence of the above, an account was stated between the plaintiff and the defendant in the sum of $306,872.64, no part of which has been paid although duly demanded.

16.    As a consequence thereof, the plaintiff has sustained damages in the sum of $306,872.64.

## THIRD CAUSE OF ACTION - UNJUST ENRICHMENT

## FOR GOODS SOLD AND DELIVERED (APRIL 2008 DELIVERY)

17.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 16 as though more fully set forth herein.

18.    By virtue of the defendant's receipt and acceptance of the merchandise referred to above (the April 2008 Delivery), and the defendant's failure to remit payment for same, the defendant has been unjustly enriched in the amount of $306,872.64.

19.    Accordingly, defendant is indebted to plaintiff in the sum of $306,872.64.

## FOURTH CAUSE OF ACTION - QUANTUM MERUIT

## FOR GOODS SOLD AND DELIVERED (APRIL 2008 DELIVERY)

20.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 19 as though more fully set forth herein.

21.    At defendant's specific request, plaintiff did supply ladies' garments to defendant (the April 2008 Delivery), in the reasonable value of $306,872.64.

22.    The defendant accepted and used said garments.

23.    The defendant has failed and refused to pay for the reasonable value of said garments, although duly demanded.

24.    As a consequence of the above, the plaintiff has sustained damages in the sum of $306,872.64.

## FIFTH CAUSE OF ACTION

## ANTICIPATORY BREACH - GOODS SOLD AND DELIVERED

## (MAY 2008 DELIVERY)

25.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 24 as though more fully set forth herein.

26.    In and around the period from May 5, 2008 through May 13, 2008, at the specific instance and request of the defendant, the plaintiff shipped and delivered to defendant, ladies'

garments, at the agreed price and reasonable value of $521,336.16 (hereinafter sometimes referred to as the "May 2008 Delivery").

27.    All of said garments in the May 2008 Delivery were delivered to defendant.

28.    A detailed listing of the items purchased and received by defendant in the May 2008 Delivery is as follows:

| Invoice Date | Invoice # | Agreed Price & Reasonable Value |
|---|---|---|
| 5/5/08 | 84238 | $ 25,953.12 |
| 5/5/08 | 84239 | 42,867.36 |
| 5/5/08 | 84240 | 18,915.84 |
| 5/5/08 | 84241 | 18,780.48 |
| 5/5/08 | 84242 | 1,821.60 |
| 5/5/08 | 84243 | 62,936.64 |
| 5/5/08 | 84244 | 1,144.80 |
| 5/13/08 | 84844 | 5,512.32 |
| 5/13/08 | 84845 | 47,328.48 |
| 5/13/08 | 84846 | 72,878.40 |
| 5/13/08 | 84847 | 38,364.48 |
| 5/13/08 | 84848 | 34,493.76 |
| 5/13/08 | 84849 | 108,724.32 |
| 5/13/08 | 84850 | 341.28 |
| 5/13/08 | 84851 | 41,273.28 |

**Total:**                                         **$521,336.16**

29.    Although the above invoices are due to be paid on June 4, 2008 and/or June 12, 2008, the defendant has indicated to plaintiff that it has no intention of paying for the May 2008 Delivery, thereby anticipatorily breaching its agreement with plaintiff to pay for said merchandise.

30.    Defendant has no grounds to refuse payment for the merchandise ordered by defendant; delivered to defendant; and accepted by defendant, in the May 2008 Delivery.

31.    As a result of the defendant's anticipatory breach of its agreement, the plaintiff has been damaged in the sum of $521,336.16.

## SIXTH CAUSE OF ACTION
## UNJUST ENRICHMENT - GOODS SOLD AND DELIVERED
## (MAY 2008 DELIVERY)

32.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 31 as though more fully set forth herein.

33.    By virtue of the defendant's receipt and acceptance of the merchandise referred to above (the May 2008 Delivery), and the defendant's intent to refuse to remit payment for same, the defendant has been unjustly enriched in the amount of $521,336.16.

34.    Accordingly, defendant is indebted to plaintiff in the sum of $521,336.16.

## SEVENTH CAUSE OF ACTION
## QUANTUM MERUIT - GOODS SOLD AND DELIVERED
## (MAY 2008 DELIVERY)

35.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 34 as though more fully set forth herein.

36.    At defendant's specific request, plaintiff did supply ladies' garments to defendant (the May 2008 Delivery), in the reasonable value of $521,336.16.

37.    The defendant accepted said garments.

38.    The defendant has indicated that it will fail and refuse to pay for the reasonable value of said garments, without justification.

39.    As a consequence of the above, the plaintiff has sustained damages in the sum of $521,336.16.

## EIGHTH CAUSE OF ACTION - BREACH OF CONTRACT - IMPROPER CANCELLATIONS

### ORDER 4815165:

40.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 39 as though more fully set forth herein.

41.    In and around July/August 2006, the defendant ordered from plaintiff, and the plaintiff agreed to sell to defendant, ladies' activewear garments including microfiber track pants and French terry hooded jackets, for the total sum and agreed price of $217,338.00.

42.    Thereafter, the defendant requested that the plaintiff hold off on delivering the merchandise referred to in Paragraph 41 above.

43.     On or about October 26, 2007 the defendant sent to plaintiff a confirmatory document, confirming defendant's agreement to purchase the merchandise referred to in Paragraph 41 above.  Said confirmatory document is identified as defendant's "EDI Blanket Order No. 4815165" (hereinafter referred to as "Order 4815165").

44.     On or about February 28, 2008 the defendant sent to plaintiff a revised EDI Blanket Order No. 4815165, changing the date for shipment of the merchandise covered by Order 4815165.

45.     The merchandise covered by Order 4815165 was ultimately scheduled to be shipped to defendant at the end of June 2008.

46.     The plaintiff, in accordance with its agreement with defendant to produce, sell and ship the merchandise covered by Order 4815165, did in fact produce said merchandise.

47.     The plaintiff has been ready, willing and able to deliver the merchandise covered by Order 4815165 in accordance with the agreement with defendant.

48.     However, on or about May 9, 2008 the defendant unilaterally canceled Order 4815165 without prior notice; without justification; and contrary to the agreement between plaintiff and defendant.

49.     As a consequence of defendant's breach of its agreement to take in and pay for the merchandise covered by Order 4815165, the plaintiff has sustained damages in the minimum sum of $217,338.00.

9

**ORDER 4719904:**

50.    In and around December 2006, the defendant ordered from plaintiff, and the plaintiff agreed to sell to defendant, ladies' capri pants and rib tank tops, for the total sum and agreed price of $263,782.00.

51.    Thereafter, the defendant requested that the plaintiff hold off on delivering the merchandise referred to in Paragraph 50 above.

52.    On or about June 18, 2007 the defendant sent to plaintiff a confirmatory document, confirming defendant's agreement to purchase the merchandise referred to in Paragraph 50 above.  Said confirmatory document is identified as defendant's "EDI Blanket Order No. 4719904" (hereinafter referred to as "Order 4719904").

53.    On or about October 24, 2007 the defendant sent to plaintiff a revised EDI Blanket Order No. 4719904, changing the date for shipment of the merchandise covered by Order 4719904.

54.    The merchandise covered by Order 4719904 was ultimately scheduled to be shipped to defendant at the end of May 2008.

55.    The plaintiff, in accordance with its agreement with defendant to produce, sell and ship the merchandise covered by Order 4719904, did in fact produce said merchandise.

56.    The plaintiff has been ready, willing and able to deliver the merchandise covered by Order 4719904 in accordance with the agreement with defendant.

57.    However, on or about May 9, 2008 the defendant unilaterally canceled Order 4719904 without prior notice; without justification; and contrary to the agreement between plaintiff and defendant.

58.    As a consequence of defendant's breach of its agreement to take in and pay for the merchandise covered by Order 4719904, the plaintiff has sustained damages in the minimum sum of $263,782.00.

**ORDER 4848493:**

59.    In and around December 14, 2007, the defendant ordered from plaintiff, and the plaintiff agreed to sell to defendant, ladies' tank tops and Bermuda shorts, for the total sum and agreed price of $383,688.00.

60.    On or about December 18, 2007 the defendant sent to plaintiff a confirmatory document, confirming defendant's agreement to purchase the merchandise referred to in Paragraph 59 above. Said confirmatory document is identified as defendant's "EDI Blanket Order No. 4848493" (hereinafter referred to as "Order 4848493").

61.    The merchandise covered by Order 4848493 was ultimately scheduled to be shipped to defendant at the end of May 2008.

62.    The plaintiff, in accordance with its agreement with defendant to produce, sell and ship the merchandise covered by Order 4848493, did in fact produce said merchandise.

63.    The plaintiff has been ready, willing and able to deliver the merchandise covered by Order 4848493 in accordance with the agreement with defendant.

64.     However, on or about May 9, 2008 the defendant unilaterally canceled Order 4848493 without prior notice; without justification; and contrary to the agreement between plaintiff and defendant.

65.     As a consequence of defendant's breach of its agreement to take in and pay for the merchandise covered by Order 4848493, the plaintiff has sustained damages in the minimum sum of $383,688.00.

**ORDER 4848497:**

66.     In and around December 14, 2007, the defendant ordered from plaintiff, and the plaintiff agreed to sell to defendant, ladies' tank tops and Bermuda shorts, for the total sum and agreed price of $3,456.00.

67.     On or about December 18, 2007 the defendant sent to plaintiff a confirmatory document, confirming defendant's agreement to purchase the merchandise referred to in Paragraph 66 above. Said confirmatory document is identified as defendant's "EDI Stand-Alone Order No. 4848497" (hereinafter referred to as "Order 4848497").

68.     The merchandise covered by Order 4848497 was ultimately scheduled to be shipped to defendant at the end of May 2008.

69.     The plaintiff, in accordance with its agreement with defendant to produce, sell and ship the merchandise covered by Order 4848497, did in fact produce said merchandise.

70.     The plaintiff has been ready, willing and able to deliver the merchandise covered by Order 4848497 in accordance with the agreement with defendant.

71.    However, on or about May 9, 2008 the defendant unilaterally canceled Order 4848497 without prior notice; without justification; and contrary to the agreement between plaintiff and defendant.

72.    As a consequence of defendant's breach of its agreement to take in and pay for the merchandise covered by Order 4848497, the plaintiff has sustained damages in the minimum sum of $3,456.00.

**ORDER 4875479:**

73.    In and around December 2007, the defendant ordered from plaintiff, and the plaintiff agreed to sell to defendant, ladies' tee tops and Bermuda shorts, for the total sum and agreed price of $479,749.50.

74.    On or about February 8, 2008 the defendant sent to plaintiff a confirmatory document, confirming defendant's agreement to purchase the merchandise referred to in Paragraph 73 above.  Said confirmatory document is identified as defendant's "EDI Blanket Order No. 4875479" (hereinafter referred to as "Order 4875479").

75.    The plaintiff, in accordance with its agreement with defendant to produce, sell and ship the merchandise covered by Order 4875479, did in fact produce said merchandise.

76.    On or about April 29, 2008 the defendant sent to plaintiff its "EDI Release or Delivery Order", authorizing the delivery of the merchandise covered by Order 4875479.

77.    In accordance with defendant's instructions, the plaintiff arranged for delivery of the merchandise covered by Order 4875479, through the defendant's designated trucker.

78.    The defendant, however, only took in $343,404.00 of the merchandise covered by Order 4875479.

79.    The defendant has refused to take in the balance of the merchandise covered by Order 4875479, and the defendant, on or about May 9, 2008, sought to cancel said order, without prior notice, or justification and contrary to the agreement with plaintiff.

80.    The plaintiff has been ready, willing and able to deliver the balance of the merchandise covered by Order 4875479 in accordance with the agreement with defendant.

81.    As a consequence of defendant's breach of its agreement to take in and pay for all of the merchandise covered by Order 4875479, the plaintiff has sustained damages in the minimum sum of $136,345.50.

82.    In addition to breaching its agreements with plaintiff to take in the merchandise referred to in this cause of action, the defendant also breached its covenant of good faith and fair dealing.

83.    As a consequence of defendant's breach of its agreements and covenant of good faith and fair dealing, the plaintiff has sustained damages in the minimum sum of $1,004,609.50.

## NINTH CAUSE OF ACTION -IMPROPER MARGIN
## ASSISTANCE, CHARGEBACKS, DEDUCTIONS,
## RETURNS AND CANCELLATIONS:
## BREACH OF CONTRACT

84.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 83 as though more fully set forth herein.

85.    During the year 2006, the plaintiff shipped to defendant approximately $7.5 million of ladies' activewear garments.

86.    During the year 2007, the plaintiff shipped to defendant approximately $10.4 million of ladies' activewear garments.

87.    In and around April 2006, the plaintiff and defendant entered into a written "Vendor Support Agreement".  Among other things, the Vendor Support Agreement provides for "Profitability Assistance" (also known as "margin support" or "margin assistance") to Kohl's to offset Kohl's purported markdowns or advertising of plaintiff's products.  Said Agreement provided that the minimum assistance to Kohl's would equal 2.5% of gross receipts from the vendor, and that any "additional support may be negotiated".

88.    There is no requirement that plaintiff provide any purported profitability assistance or margin support to Kohl's in excess of 2.5% of gross receipts.

89.    Kohl's induced the plaintiff to sign the Vendor Support Agreement (hereinafter referred to as the "VSA"), calling for a 2.5% margin assistance, with the undisclosed intent that

it -- Kohl's -- would in fact require plaintiff to provide significantly higher margin assistance in order for Kohl's to obtain as much as a 43% gross margin on its own sales.

90.    Kohl's did not advise the plaintiff of defendant's intent to require margin assistance that would enable Kohl's to obtain as much as a 43% gross margin, at the time plaintiff signed the VSA.

91.    Plaintiff relied upon the 2.5% provision in the VSA, and did business with Kohl's based, at least in part, on the 2.5% provision in the VSA.

92.    Plaintiff would not have done business with Kohl's if plaintiff had known that defendant would demand and require plaintiff to provide margin assistance well in excess of the 2.5%.

93.    Kohl's induced plaintiff to do business with Kohl's, and Kohl's continued to increase its orders with plaintiff, with the undisclosed intent of requiring the plaintiff to provide margin assistance to defendant in order for Kohl's to obtain up to a 43% gross margin, contrary to the VSA.

94.    Because of the extreme disparity in economic and bargaining power between the defendant and the plaintiff, the defendant has been able to coerce plaintiff, as well as many other vendors in the industry, into not challenging the improper margin assistance practice, or in acquiescing in said practice, whether or not the margin assistance was proper, all to the serious detriment of plaintiff and other vendors.

95.    In addition, upon information and belief, the defendant has a policy of intentionally over-ordering merchandise from vendors, including the plaintiff, with the intent of

either returning excess merchandise; canceling orders; and/or compelling vendors to give money to the defendant in order to make up the purported profit margin desired by defendant.

96.    Upon further information and belief, because the defendant is a public corporation, its reported sales to the public and to the investment community, are a significant part of its business.   Consequently, the defendant seeks to report ever-increasing sales, and the defendant has adopted a plan and strategy to push sales volume, even at the cost of its gross margin, by aggressively promoting special sales prices, and promoting aggressive markdowns of its merchandise to lure the consumer into buying the merchandise.

97.    As part of this plan and policy, the defendant intentionally over-orders merchandise from its vendors, including the plaintiff, without advising such vendors that Kohl's was intentionally over-ordering the merchandise.  By having excessive merchandise available, Kohl's can accomplish its purpose of aggressively selling it at discounted prices, even if Kohl's' gross margin number suffers as a result of the promotional pricing.

98.    In addition, Kohl's' undisclosed policy and intent is that if, by virtue of the over-ordering of merchandise and the promotional pricing, its gross margin does in fact suffer, then Kohl's will demand margin assistance from the vendors – whether by deducting monies from open invoices, or returning merchandise, or canceling future orders -- as it has done with plaintiff, even though there is no requirement that the vendors provide such additional margin assistance.  However, in the event the vendors do not provide the requested margin assistance to Kohl's, Kohl's threatens to cease further business with the vendor, as it did with plaintiff.

99.    Hence, Kohl's thereby seeks to report to Wall Street, and to the public, that its sales are increasing, and that (by virtue of it coercing vendors to provide the requested margin assistance), Kohl's is also meeting its gross margin projections.  The truth, however, is that

Kohl's is artificially increasing its sales, and artificially reaching its gross margin numbers, through its fraudulent and improper demands upon its vendors, including the plaintiff.

100.    Kohl's' policy and intent to over-order merchandise from plaintiff, with the further intent to either return excess merchandise; cancel orders; and/or compel the plaintiff to give money to the defendant in order to make up the purported profit margin desired by defendant, was not divulged to plaintiff at the time the defendant issued orders to, and agreed to purchase merchandise from, the plaintiff.

101.    The plaintiff proceeded with the manufacture and production and shipment of the merchandise ordered by Kohl's, expecting to be properly paid for said merchandise.

102.    During 2007 and into 2008, the defendant, primarily through its Buyer, Assistant Buyer and Divisional Merchandise Manager – Julie Silhol, Andrea Kohler and Stephen Binkley, respectively – compelled the plaintiff to give the defendant inflated and improper margin support in order to maintain the parties' business relationship and ongoing contracts.  In addition to deducting huge sums of monies from outstanding invoices of the plaintiff (called chargebacks or deductions), the defendant also induced the plaintiff to accept huge returns of merchandise, with the promises of significant ongoing business in the future.

103.    The chargebacks, deductions and returns of merchandise during 2007 and 2008 have totaled in excess of $3.0 million, and have greatly exceeded the agreed 2.5%.

104.    The defendant deducted these improper chargebacks and margin support from outstanding invoices of the plaintiff, thereby improperly withholding payments from plaintiff.

18

105.    In fact, the defendant continuously required plaintiff to provide margin support well in excess of the 2.5% by requiring plaintiff to authorize deductions from invoices; cancellations of orders; and/or returns of merchandise. In seeking said margin support, the defendant, through its employees Julie Silhol, Andrea Kohler and Stephen Binkley, repeatedly advised plaintiff that plaintiff was defendant's "partner", and as such, plaintiff was compelled to provide the requested assistance. And in furtherance of defendant's appeal to plaintiff as its "partner", the defendant, through Silhol, Kohler, and Binkley, represented to plaintiff that without the requested margin support, the plaintiff would no longer be a vendor to the defendant.

106.    The defendant, consequently, induced, coerced and compelled the plaintiff to provide excessive and improper margin support by advising the plaintiff that it would continue to be a "partner" with defendant, and a vendor to defendant, for subsequent seasons and years, if and only if plaintiff cooperated with defendant. Indeed, on August 3, 2007 Kohler advised plaintiff's employee, Steven Cohn, that "You and your team are great partners, and we thank you for your continued support."

107.    In addition, in and around the end of July 2007, at the Kohl's offices in Milwaukee, Wisconsin, in meetings and discussions between employees of plaintiff – Mark Wiesner and Steven Cohn – and Andrea Kohler of Kohl's, and in subsequent discussions between them into August 2007, Ms. Kohler indicated that if plaintiff provided the margin assistance sought by Kohl's at that time, then the orders of defendant for Spring 2008 merchandise would increase by approximately 8%, and plaintiff's merchandise would be in an additional 100 stores over and beyond those in 2007. In addition, Ms. Kohler also discussed further orders for plaintiff for a table tower display for Spring 2008, which would significantly increase the business between plaintiff and Kohl's for 2008, if plaintiff provided the margin assistance.

108.    The plaintiff would not have provided said margin assistance, or taken back merchandise from defendant in 2007, without the defendant's representations that plaintiff was a partner and that defendant would increase the business with plaintiff for Spring 2008 and beyond.

109.    Further, in a follow-up meeting at the Kohl's offices in Milwaukee on August 22, 2007, between – for plaintiff, its Executive Vice President, Ms. Jing Deng, and Mark Wiesner and Steve Cohn – and for defendant, Andrea Kohler and Vanessa Ruminsky, the defendant induced, coerced and compelled the plaintiff to allow a return of hundreds of thousands of dollars of merchandise; cancellation of a large order that was due to, and available to be, shipped to defendant in August, as well as allowing deductions of over $300,000 from invoices, with assurances to plaintiff, once again, that plaintiff was a great partner; that defendant recognized plaintiff's commitment to defendant; and that defendant was committed to plaintiff.

110.    Thereafter, in late August 2007, the defendant, through Ms. Kohler, indicated to plaintiff that Kohl's expected to do at least $10 million in business with plaintiff during 2008.

111.    The plaintiff did in fact take back hundreds of thousands of dollars in merchandise, allowed the cancellation of the order, and allowed the deduction of over $300,000 from invoices by defendant, based upon defendant's aforesaid representations and assurances to plaintiff.  In addition, without such representations and assurances, the plaintiff would not have allowed said returns, cancellation or deduction.

112.    Thereafter, in December 2007 and January 2008, Kohl's sought an additional $1,019,000 in margin support from plaintiff for 2007.

113.    Numerous discussions and correspondence were held and transmitted between plaintiff - by Deng, Wiesner and Cohn – and defendant – by Silhol, Kohler and Binkley.  In fact, on January 29, 2008 Kohler wrote to plaintiff:

> "I know you are working diligently on our Fall 2007 margin need of $1,019,000. We are, as I'm sure you are aware, in a very difficult situation ourselves and really need you to be able to come to us with the full need.  We definitely value your partnership and everything you have done for us this year.  Our situation is one of great need across the board, and we are asking all of our partners to come to the table in full, as pressure is definitely upon us to hit our margin plans."

114.    Nonetheless, the plaintiff did not agree to give the defendant the $1,019,000 in margin assistance.

115.    However, without any right or agreement by plaintiff, the defendant improperly deducted the sum of $1,028,000 from open invoices of plaintiff, on or about February 6, 2008.

116.    The plaintiff never agreed to defendant's deduction of the $1,028,000.

117.    In addition, the defendant, during the first half of 2008, sought additional margin assistance of over $400,000 from plaintiff.  Once again the plaintiff refused to acquiesce.

118.    In response to the plaintiff's objections to the deduction of $1,028,000 and the additional request of over $400,000, the defendant unilaterally and improperly cancelled outstanding orders with plaintiff, and has failed to remit payment of over $300,000 (and shortly to be over $800,000) for invoices that are past due.

119.    In addition, contrary to defendant's representations and assurances during 2007 and into 2008, the defendant failed to give to plaintiff the additional business promised for Spring or Fall 2008.

120.    Hence, the threats of defendant to cease business with plaintiff if it did not cooperate with defendant's repeated and improper requests for margin support, were in fact borne out by the defendant's improper cancellations of orders, withholding of payments, and cessation of business.

121.    The defendant obviously intended to cease doing business with plaintiff if plaintiff did not agree to the excessive and improper chargebacks, deductions, cancellations and returns in 2007 and 2008, and defendant had promised plaintiff future business in order to take advantage of plaintiff and reap the unilateral benefits of the chargebacks, deductions, etc.

122.    Defendant had a clear motive to commit fraud against the plaintiff and make false representations at the time of the meetings, discussions and communications referred to above, in that defendant stood to gain large sums of money from plaintiff if plaintiff believed and relied upon defendant's false representations, and accommodated the requested chargebacks, deductions, etc.

123.    Additionally, upon information and belief, senior executives of the defendant receive bonuses and/or incentives based upon the defendant's performance, and they therefore place inordinate pressure upon defendant's employees – such as Silhol and Kohler – to hit their arbitrary margin plans.

124.    Upon further information and belief, the practice of the defendant in issuing improper chargebacks, deductions and margin assistance allowances to plaintiff and to other

vendors in the industry inflated the defendant's financial performance and thereby benefitted those senior executives whose bonuses and incentives were based upon the defendant's financial performance.

125.    Said senior executives therefore had personal financial motives and incentives to encourage the defendant and its appropriate employees to issue improper and excessive chargebacks, cancellations and returns to the plaintiff and other vendors.

126.    In addition, by virtue of the great disparity in economic and bargaining power between plaintiff and defendant, the defendant had the clear opportunity and ability to commit fraud against plaintiff, since as a small supplier to defendant, defendant's original increase in its orders to plaintiff caused plaintiff's business to heavily rely upon defendant, and to therefore also rely upon defendant's representations.  The defendant thereby used its economic size and strength to coerce plaintiff to accommodate defendant's requests for margin assistance.

127.    Furthermore, upon information and belief, in and around November 2007, the defendant entered into a multi-year, exclusive license to sell merchandise in defendant's stores under the name "Fila".

128.    Upon information and belief, the defendant negotiated the exclusive license with Fila during at least the second and third quarters of 2007.

129.    Based upon the license with Fila, the defendant intended to reduce its volume of business - for the years 2008 and beyond - with other activewear vendors that it had been doing business with during 2007, and to replace that business with business from Fila.  In fact, Kohl's President, Kevin Mansell, was quoted as saying that Kohl's would maintain its Nike and Addidas

products at their current levels, but Kohl's would "cut back on some other sports brands to make room" for Fila on its shelves.

130.    Unbeknownst to plaintiff, and contrary to the representations given to plaintiff, one of the vendors that defendant intended to reduce its business with during 2008 was the plaintiff.

131.    However, the intent to reduce its business with plaintiff was known by the defendant during at least the second, third and fourth quarters of 2007, as well as in 2008. This intent was known by Steven Binkley, Julie Silhol and Andrea Kohler, and at the time the defendant, through these employees, made the representations to plaintiff from August 2007 into 2008 regarding giving plaintiff substantial future business, the defendant had the undisclosed intention of not performing its representations and assurances.

132.    In fact, the defendant did not advise the plaintiff that, because of the exclusive license agreement with Fila and the consequent business defendant would do with Fila, the defendant intended to reduce its ongoing business with defendant. To the contrary, as noted above, the defendant was still assuring plaintiff of its "partnership" with Kohl's and future business with Kohl's at the time Kohl's was seeking to obtain $1,019,000 from plaintiff in January 2008, and the only reason that the defendant was providing these false assurances and representations to plaintiff was in order to induce plaintiff to continue to provide excessive and improper margin assistance to defendant.

133.    The representations made by defendant to plaintiff as detailed above, and the concealment by defendant of necessary and material facts and information from the plaintiff regarding defendant's intent to continue to do business with plaintiff and to increase said business for 2008, were false when made; were made by defendant's representatives with

24

knowledge of their falsity and with the intent to have plaintiff rely on said false representations in order to induce plaintiff to provide all margin assistance requested by defendant for 2007 and 2008; the plaintiff did in fact rely upon the defendant's false representations and the defendant's concealment of material facts; and the margin assistance that plaintiff did in fact provide was done so in reliance upon said false representations, all to plaintiff's severe damage.

134.    Had plaintiff known defendant's true intent, plaintiff would not have granted the margin assistance that it did during 2007, nor would plaintiff have taken back merchandise from defendant, or allowed cancellations during 2007. However, in reliance upon the defendant's false representations, the plaintiff did take back merchandise, allow cancellations and allow certain deductions in 2007, all to plaintiff's serious detriment and loss.

135.    The chargebacks, deductions, returns, allowances and cancellations by defendant during 2007 and 2008 violated defendant's agreements with plaintiff, and violated defendant's covenant of good faith and fair dealing.

136.    By virtue of the defendant's breach of its agreements with plaintiff, including the Vendor Support Agreement, as well as its breach of the covenant of good faith and fair dealing, the plaintiff has been damaged in a sum to be determined at trial, but believed to exceed $3,000,000.00.

## TENTH CAUSE OF ACTION -IMPROPER MARGIN

## ASSISTANCE, CHARGEBACKS, DEDUCTIONS, RETURNS

## AND CANCELLATIONS:

## RESTITUTION

137.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 136 as though more fully set forth herein.

138.    By virtue of the defendant's wrongful actions set forth herein, it has received and/or retained monies to which it is not entitled.

139.    As a consequence thereof, the plaintiff has been damaged in a sum to be determined at trial but believed to exceed $3,000,000.00.

## ELEVENTH CAUSE OF ACTION -IMPROPER MARGIN

## ASSISTANCE, CHARGEBACKS, DEDUCTIONS, RETURNS

## AND CANCELLATIONS:

## FRAUD

140.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 139 as though more fully set forth herein.

141.    The defendant's misrepresentations and concealment of material facts, as set forth above, were done with the knowledge of their falsity and with knowledge of the concealment of material facts, and with the intent of having the plaintiff rely on said representations and concealment, to its detriment.

142.    The plaintiff did in fact rely on the false representations and concealment of the defendant, to its significant damage.

143.    As a consequence thereof, the defendant has committed fraud against the plaintiff, as well as against the public.

144.    As a further consequence thereof, the plaintiff has been damaged in a sum to be determined at trial but believed to exceed $3,000,000.00.

## TWELFTH CAUSE OF ACTION -IMPROPER MARGIN ASSISTANCE, CHARGEBACKS, DEDUCTIONS, RETURNS AND CANCELLATIONS: UNJUST ENRICHMENT

145.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 144 as though more fully set forth herein.

146.    By virtue of the defendant's improper actions set forth above, it has been unjustly enriched.

147.    As a consequence thereof, the plaintiff has sustained damages in an amount to be determined at trial, but believed to exceed $3,000,000.00.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff hereby demands trial by jury of all issues triable of right by jury.

**WHEREFORE,** plaintiff respectfully demands judgment against the defendant, as follows:

a.    On the first cause of action, the sum of $306,872.64;

b.    On the second cause of action, the sum of $306,872.64;

c.    On the third cause of action, the sum of $306,872.64;

d.    On the fourth cause of action, the sum of $306,872.64;

e.    On the fifth cause of action, the sum of $521,336.16;

f.    On the sixth cause of action, the sum of $521,336.16;

g.    On the seventh cause of action, the sum of $521,336.16;

h.    On the eighth cause of action, a sum to be determined at trial, but believed to exceed $1,004,609.50;

i.    On the ninth cause of action, a sum to be determined at trial, but believed to exceed $3,000,000.00;

j.      On the tenth cause of action, a sum to be determined at trial, but believed to exceed $3,000,000.00;

k.      On the eleventh cause of action, a sum to be determined at trial, but believed to exceed $3,000,000.00;

l.      On the twelfth cause of action, a sum to be determined at trial, but believed to exceed $3,000,000.00;

m.      Plus interest, plaintiff's costs, disbursements and attorneys' fees incurred in the prosecution of the within action, and such other and further relief as this Court shall deem just and proper.

Dated: New York, New York
       June 4, 2008

                                    SCHLACTER & ASSOCIATES
                                    Attorneys for Plaintiff
                                    450 Seventh Avenue
                                    New York, New York 10123
                                    (212) 695-2000


                                    By: _____
                                        Jed R. Schlacter (JRS 4874)

JUN. 19. 2008 1:12PM    SCHLACTER & ASSOCIATES    B 302 / J√√    NO. 4733.00:P. 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

FU DA INTERNATIONAL, LTD.,                    Docket No.: 08 CV 5164 (HB)

                    Plaintiff,

        -against-

KOHLS DEPARTMENT STORES, INC.,

                    Defendant,
-----------------------------------------------------------X

S I R S :

        IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned attorneys of records for all parties to the above entitled action, that the defendant's time within which to respond to plaintiff's complaint is hereby extended to July 18, 2008.

                                                14 gab

Dated: Carle Place, New York
        June 16, 2008

STEVEN F. GOLDSTEIN, LLP                SCHLACTER & ASSOCIATES
Attorneys for Defendant                 Attorneys for Plaintiff
One Old Country Road                    450 Seventh Avenue
Carle Place, New York 11514             New York, NY 10123
(516) 873-0011                          (212) 695-2000

SO ORDERED:

Harold Baer, Jr., U.S.D.J.

Date:  July 1, 2008

                                        U.S.D.J.

# EXHIBIT B

04/06/2006  14:19    2122928089                    FUDA INTL                           PAGE  02

*Dept 143*

# KOHL'S
### expect great things

Date:     April 4, 2006

To:       Fu Da International
          Steve Cohn
          Vice President Sales

From:     David Plummer
          Misses Active and Fitness

Re:       Vendor Support Agreement

This document outlines terms and conditions governing all purchase orders, in addition to those terms and conditions on www.connection.kohls.com. This agreement is effective for all Spring 06 orders and will remain in place for all 2006 purchases and until such time as a new signed agreement is entered into.

## Payment Terms
- Net 30 days dating for all orders

## New Store Discount
- 5% discount on all new store gross cost orders defined as initial orders, flow back orders and the new store portion of bulk orders delivered with in 30 days of grand opening..
- Discounts shall be deducted off the initial, flow back and the new store portions of bulk order invoices.
- Flow back orders are defined as any order that replenishes a new store within 30 days of opening.
- Initial new store orders shall be given 60 days terms.

## Defective Allowance
- 0.5% defective allowance off all gross receipts at cost taken as a deduction off all invoices.

## Broadcast Optimization
- A  1%  broadcast support deduction will be taken off all gross receipts at cost taken as a deduction off all invoices.

## Profitability Assistance and Advertising Co-op
- Profitability assistance will be used to offset markdowns taken or advertising run to promote your product.  The method of collection will be a deduction from invoice; however, this support is not linked to the invoiced merchandise. All support will be used to offset advertising run or markdowns taken prior to the time of the deduction being taken.
- This assistance is the minimum guaranteed. Additional support may be negotiated in addition to this assistance.
- The minimum assistance will equate to 2.5% of gross receipts for the term of this agreement and shall be taken monthly upon authorization from the vendor.

By signing this agreement your company agrees to all the terms and conditions described herein.

Signature: _____          Title: _Exec V. P_

Date: _4/5/2006_

CORPORATE OFFICES ● N56W17000 RIDGEWOOD DRIVE ● MENOMONEE FALLS, WISCONSIN 53051 ● (262) 703-7000

# Merchandise Purchase Order Terms and Conditions

The Terms and Conditions contained herein shall be effective for all merchandise ("Merchandise") sold by you to Kohl's Department Stores, Inc. ("Kohl's"). These Terms and Conditions, the terms contained in Kohl's Purchase Order, Kohl's EDI Trading Partners Agreement, Kohl's Vendor Partnership Requirements and Kohl's Terms of Engagement for Kohl's Business Partners, each as amended from time to time (copies of which you acknowledge you have received and the terms of which you acknowledge you have reviewed) are collectively referred to herein as the "Purchase Order". These Terms and Conditions, Kohl's Vendor Partnership Requirements and the Terms of Engagement for Kohl's Business Partners may be found on the Internet at https://www.connection.kohls.com. The terms and conditions contained herein shall be effective for all goods, materials and Merchandise sold by you to Kohl's:

**PURCHASE ORDERS:** Our commitment to purchase Merchandise shall arise only at such time as Kohl's issues a Purchase Order for specified quantities of Merchandise and Kohl's obligation to purchase Merchandise shall be limited to the quantities contained in the Purchase Order issued. All shipments against a valid Purchase Order shall be considered acceptance of our Purchase Order. Any estimate or forecasts of Kohl's future needs for Merchandise which may be provided to you by us are for long range planning purposes only and shall in no way represent a commitment of Kohl's. Kohl's shall have no responsibility for any actions taken by you based on such estimates or forecasts.

**SHIPMENT OF MERCHANDISE:** Time is of the essence. All Merchandise must be delivered to our designated carrier as selected by us, on or before the "Cancellation Date" specified in our Purchase Order for Merchandise or services, but not before earliest ship date specified. Merchandise shipped prior to the date specified will, at our option, be subject to a storage charge of the greater of (i) 3% of the face value thereof or (ii) the actual storage costs incurred by Kohl's. We may regard our Purchase Order as having been lapsed and therefore null and void if Merchandise is delivered to our designated carrier after the "Cancellation Date".

**OFFER & ACCEPTANCE:** Our Purchase Order is not valid unless: (i) it is computer generated, pursuant to a valid electronic data interchange (EDI) transmission; or (ii) a written Purchase Order is signed by both our authorized Buyer and our authorized Divisional Merchandise Manager. Shipment to us of any part of the Purchase Order shall constitute your acceptance of the Purchase Order for all Merchandise ordered herein and acceptance of all terms, conditions and instructions, including, but not limited to, those printed in our Vendor Partnership Requirements and Kohl's Terms of Engagement.

The terms and conditions contained in our Purchase Order, these Terms and Conditions, our Vendor Partnership Requirements, Kohl's EDI Trading Partners Agreement and Kohl's Terms of Engagement and no others shall constitute the entire contract between us. These documents may not be modified by course of dealing or course of performance. Any oral communication between us or any response by you, whether oral or in writing to modify or supplement the terms of the Purchase Order issued by us shall be ineffective unless such response is in writing executed by us. Kohl's offer to purchase Merchandise from you is expressly limited to the terms and conditions set forth herein. Any deviation by you from our Purchase Order or demand by you for additional or different terms and conditions, or any statement made by you in an invoice or otherwise attempting to make your acceptance conditional on our assent to additional or different terms and conditions shall be of no effect, and are objected to and expressly rejected. Your receipt of our Vendor Partnership Requirements or your acceptance of our Purchase Order shall constitute notice to you of these, our standard Vendor Partnership Requirements, which, unless otherwise stated, shall govern all purchases made by us from you.

**PRICE AND SHIPPING:** The price specified in our Purchase Order shall include all costs of packing Merchandise and all costs of delivery of Merchandise to the "F.O.B. point" or other delivery point specified in the applicable Purchase Order, including (a) all duties and taxes (including excise and withholding taxes) payable in any country where production or delivery takes place; (b) any commissions to selling agents; and (c) other incidental charges, whether or not such charges

are itemized separately on invoices to us. You shall ship only the quantities of Merchandise ordered by us in the applicable Purchase Order. You shall not make any substitutions without our prior written approval. You shall bill us for the Merchandise at the price specified in the applicable Purchase Order.

**PAYMENT:** Our Purchase Order is subject to anticipation for prepayment. Discount and anticipation shall be computed from date of receipt of goods to the designated facility or store location designated by us. For purposes of this paragraph, Merchandise or an invoice received on or after the 25th day of any month shall be deemed received as of the first of the following month unless otherwise specified. Payment shall be made by us in accordance with the payment terms previously agreed to by us.

**TERMS OF ENGAGEMENT:** You acknowledge that we have provided you with a copy of Kohl's Terms of Engagement and that our buying agents and employees are required to follow the Terms of Engagement. You shall comply with and support the Terms of Engagement and shall not take any action which will violate the Terms of Engagement. You shall report to us any violations or attempted violations of the Terms of Engagement and certify your compliance with our Terms of Engagement if you are requested to do so by us.

**NEW STORE DISCOUNT:** All Purchase Orders or portions of Purchase Orders designated by us to stock store locations not heretofore operated by us (including any Purchase Order for which we specify a cancel date up to thirty (30) days after such store's Grand Opening event) are subject to a "new store discount" of a minimum of five percent (5%) and in addition to the payment terms described above, a minimum of sixty (60) additional days from receipt of verification by us within which to pay for the Merchandise.

**NO VERBAL CHANGES:** Our Purchase Order may not be changed or terminated verbally. No change or termination of our Purchase Order made at any time shall be binding on us unless signed by both our authorized Buyer and authorized Divisional Merchandise Manager.

**ASSIGNMENT:** You agree not to assign any rights or delegate any duties hereunder, except the right to receive payment for conforming Merchandise. Any other assignment or delegation, whether by operation of law or otherwise, is void and not binding on us without our prior written consent. No assignment or delegation (including assignment of the right to receive payment), with or without notice, shall bar us from asserting against you or the transferee or both any claim against you whether or not arising out of our Purchase Order and whether or not accrued at the time of assignment or delegation. Any adjustments made with you or returns made to you for credit shall be binding upon you and any assignee or delegatee. If you make any assignment or delegation in violation of the foregoing, in addition to our other rights and remedies available under our Purchase Order, at law or in equity, we may cancel the undelivered balance of our Purchase Order without liability to us except for Merchandise previously accepted.

**CANCELLATION:** We may cancel our Purchase Order in whole or in part in the event of any of the following, each of which it is agreed will substantially impair the value of the whole Purchase Order to us: (a) there is any breach of your representations and/or warranties hereunder; (b) there is any delay in delivery or performance or departure from delivery and routing instructions; (c) there is any variation from the quantities, quality, assortment, prices, services or other terms and conditions specified in this Purchase Order; (d) there is any breach of your obligations hereunder; (e) the Merchandise becomes the subject of any claim by any third party; (f) you become insolvent or make an assignment for the benefit of creditors, or a receiver for your assets or business is appointed; or (g) in the event of acts of God (including, but not limited to, natural disasters, fire, flood, earthquake, and disease outbreaks), lock-out, strike, war, civil commotion or disturbances, acts of public enemies, government restrictions, riots, insurrections, sabotage, blockage, embargo, or other causes beyond our reasonable control. In such event, you shall immediately stop all work and observe any instruction from us as to work in process. Cancellation by Kohl's for any of the foregoing reasons shall constitute

"for cause" and shall not subject us to any liability, cost, or charge whatsoever. We may also cancel this Purchase Order in whole or in part without cause at any time. In the event of such cancellation without cause, our liability to you shall be limited to the contract price of that portion of this Purchase Order fully and properly performed by you and received by us prior to such cancellation, plus the actual, documented out of pocket costs you reasonably incur in contemplation of performance of the canceled portion, less any amount saved by as a result of such cancellation and less any amounts which could have reasonably been mitigated by you.

**USE OF PURCHASER'S TRADE NAME AND TRADEMARKS:**

Kohl's Illinois, Inc. is the owner of certain intangible assets including the trade name, service mark and logo "Kohl's" and "Kohl's Department Stores" as well as various proprietary brand names, marketing handles and other trademarks relating to Merchandise (collectively with any other trademarks licensed to us by third parties, "Kohl's Identification"). We have licensed these intangible assets from Kohl's Illinois, Inc. and are obligated to ensure correct usage of such intangible assets. You agree not to use "Kohl's" or "Kohl's Department Stores" or any other Kohl's Identification or the trade names or trademarks of Kohl's Illinois, Inc. directly or indirectly for advertising or publicity purposes without, in each instance, obtaining the prior written consent of a Vice President (or higher) from the Marketing Department of Kohl's.

If we direct you to mark or label any Merchandise with Kohl's Identification licensed to us, such marking or labeling shall be limited to the indicated quantities of such Merchandise and shall be done in accordance with our specific instructions. You shall not sell or otherwise dispose of, nor permit the sale or disposal of, any Merchandise bearing any Kohl's Identification (including any rejected Merchandise or nonconforming Merchandise) to anyone other than us without first obtaining our express written consent and then only after first removing all Kohl's Identification prior to such sale or disposal. You shall bear all costs and expenses relating to such removal. Without limiting the foregoing, you shall not dispose of any Merchandise anywhere in the United States that is not purchased by us without our prior written authorization, which may be withheld at our sole and absolute discretion. We may elect, but shall have no obligation, to purchase from you any surplus labels, packaging or other materials bearing Kohl's Identification. All such materials not purchased from you by us shall be destroyed at the cancellation or termination of the Purchase Order. You shall have no interest or rights in any Kohl's Identification. Any approved use of Kohl's Identifications by you and the goodwill generated thereby shall inure to the benefit and be the property of Kohl's. The provisions of this Section shall survive the cancellation or termination of any Purchase Order. You acknowledge that your violation of any provision set forth herein constitutes a breach of this Purchase Order that will cause immediate and irreparable harm and that we will be entitled to entry of (among other things) immediate preliminary and/or permanent injunctive relief against you. Merchandise (irrespective of whether it is defective or nonconforming) that bears any Kohl's Identifications, trademarks, trade names, artwork or graphic designs may not be disposed of by you within the United States without our prior written authorization, which may be withheld at our sole and absolute discretion.

**ARTWORK/GRAPHIC DESIGN AND PATENTS:**

You agree all artwork, graphics, designs and mechanical features created, adapted, produced or designed by you for us in the course of selling Merchandise to us or performing services for us or provided by us to you, together with any copyrights or patents on such artwork, graphics, designs or mechanical features are "works made for hire" and are our exclusive property. You shall not disclose works made for hire to anyone other than us or your employees. Such artwork, graphic designs and mechanical features shall be used only on Merchandise manufactured for or sold to us, except as otherwise provided herein. You hereby irrevocably assign to us the ownership of such artwork, graphic designs and mechanical features, and all rights of copyright, trademark and patent in such artwork, graphic designs or mechanical features and we shall have the right to obtain and hold in our name rights of copyright, copyright registration, trademarks and patents and similar protections which may be available in the artwork, graphic designs and mechanical features.

<u>**Merchandise Purchase Order Terms and Conditions**</u>

You shall not claim or seek protection which may be available for intellectual property contained in or incorporated into the Merchandise. You shall cooperate with us and provide to us all assistance reasonably required for us to protect such rights.

**MERCHANDISE TO BE BRANDED UNDER KOHL'S PRIVATE OR EXCLUSIVE LABEL BRANDS**

Without limiting the foregoing provisions on Artwork/Graphic Design and Patents, special considerations arise when Merchandise purchased by Kohl's is branded under Kohl's private or exclusive label brands. As such, with respect to any and all Merchandise you supply to Kohl's that is branded under a Kohl's private or exclusive label brand, you hereby expressly acknowledge and agree, in addition to all other terms set forth herein, that all artwork, graphics, designs and mechanical features created, adapted, produced or designed by you of any kind or nature (draft form, final or otherwise) for Kohl's in the course of providing any Kohl's private or exclusive label Merchandise (collectively, "Designs"), together with any copyrights or patents on Designs are "works made for hire" owned by Kohl's, and are Kohl's exclusive property. You agree not to disclose the Designs to anyone other than Kohl's, and the Designs shall be used only in connection with the Kohl's private or exclusive label Merchandise ordered by Kohl's from time to time. Kohl's shall have the exclusive right to obtain and hold in Kohl's name rights of copyright, copyright registration, trademarks, patents and similar protections which may be or become available in the Designs. You shall not claim or seek protection which may be available for intellectual property contained in or incorporated into Kohl's private or exclusive label Merchandise or Designs, and you shall cooperate with Kohl's and provide to Kohl's all assistance reasonably required for Kohl's to obtain or protect such rights. You represent and warrant that (1) the Designs are new original designs, created exclusively for use on Kohl's private or exclusive label merchandise; (2) the Designs have never been the subject of any lawsuit, threatened lawsuit or other intellectual property or contractual claim by any third party; (3) the Designs are in compliance with all Applicable Laws; (4) reproduction, sale or use of the Designs by Kohl's or any of its affiliated companies in any manner of its choosing, including, but not limited to, the production of other merchandise for sale, will not constitute an infringement or violation of the rights of any person or company with respect to the Designs; and (5) in addition to any other right or remedy available to Kohl's under our Purchase Order, you shall indemnify, defend and hold Kohl's harmless from and against any and all allegations, demands, claims, liabilities, damages, causes of actions, suits, judgments, awards, fines, penalties, debts, losses, costs or expenses, including, but not limited to, attorneys' fees and costs of settlement (collectively "Claims"), which Kohl's may suffer, sustain or become subject to arising out of your performance or non-performance of your duties hereunder and/or your breach of the representations or warranties set forth herein.

**MERCHANTABILITY:**

You warrant and represent that all Merchandise delivered pursuant to our Purchase Order will (including all of its related packaging, labeling and printed materials, in addition to any express warranties or guarantees heretofore or hereafter made by you), (i) conform to the description and specifications thereof contained herein and the Merchandise samples, (ii) be free from any defects in design, construction, material, packaging or workmanship, (iii) be merchantable at the time of delivery to us and at time of use by our customers, and (iv) be fit and safe for sale and any use by us or our customers for which such items are originally intended and any particular intended use of or for which you or your agents have knowledge.

You shall defend, indemnify and hold us harmless from and against all Claims on account of any defects in the Merchandise or on account of any breach of this warranty and the terms hereof including, but not limited to, compliance with all Applicable Laws. In addition, and without limiting any other representations, warranties or indemnification obligations set forth herein, at your sole cost and expense, you shall defend, indemnify and hold us harmless from any and all Claims arising out of, or in any manner based upon the performance or nonperformance of this Purchase Order (including, but not limited to, any breach of any representations or warranties set forth herein), or arising or occurring by the purchase, use or sale of the Merchandise, or advertising of the Merchandise. Without limiting the foregoing, you agree to maintain general liability and product liability insurance providing broad form vendor's coverage in each case to afford protection to the limits of not less than that

<u>Merchandise Purchase Order Terms and Conditions</u>

customarily maintained by comparable vendors and suppliers, but in any event not less than $2,000,000 for combined single limit for personal injury and property damage to any one person and naming us as an additional insured to cover your indemnification obligations described herein. At our request, you will provide us with a Certificate of Insurance evidencing such coverage.

**COMPLIANCE WITH LAWS; VENDOR COVENANTS:**

You warrant, covenant and represent that A) You have and will comply with all Applicable Laws relevant to your performance under this Purchase Order; and B) all Merchandise delivered pursuant to our Purchase Order was produced, processed, manufactured, represented, described, packaged, labeled, tagged, packed, advertised, sold, invoiced and shipped in full compliance with Applicable Law; and C) neither our acquisition nor our sale of Merchandise shall violate Applicable Law. Applicable Law shall include, but not be limited to: (i) all existing laws, regulations, standards, orders and rulings, as amended, together in all standards, rules and guides of all United States federal, state and local governments (and all departments, boards, bureaus and commissions thereof), including, but not limited to the Federal Trade Commission Act, Fair Labor Standards Act, the Tariff Act of 1930, the Consumer Product Safety Act, the Flammable Fabrics Act, the Textile Fiber Products Identification Act and regulations relating to statement of fiber content of rayons, wool, linens, and other textiles contained in such Merchandise, the Wool Products Labeling Act, the Care Labeling Rule, the Fair Packaging and Labeling Act, the Magnusson-Moss Warranty Act, the Federal Hazardous Substances Act, the Poison Prevention Packaging Act, the Radiation Control for Health and Safety Act, the Food, Drug and Cosmetics Act, the Federal Child Labor Act, the Occupational Safety and Health Act, the Fur Products Labeling Act, California's Proposition 65, the Clean Diamonds Trade Act, the Kimberly Process Certification, the Foreign Corrupt Practices Act and all United Nations' resolutions; and (ii) the laws, regulations and rules of all countries in which Merchandise is produced or delivered. You certify that the country of origin of all Merchandise will be as listed on the Merchandise labels. All electrical products shipped to us must be certified and approved by Underwriters Laboratory or ETL SEMKO. As to Merchandise manufactured outside the United States, you shall also comply with all applicable laws of the country where the Merchandise was manufactured.

You agree to execute and affix to your invoice any certificates and other reasonable documents in form satisfactory to us or laboratory results which we may require to evidence your compliance with the foregoing. You agree to furnish us with any continuing guaranty filed with the Federal Trade Commission or Consumer Product Safety Commission indicating that the products covered by our Purchase Order are properly labeled in accordance with the particular law and regulations pertaining thereto and comply with applicable standards or tests relating thereto. Your failure to provide any documents, warranties or laboratory results which we request to verify or warrant your compliance with federal, state or local laws, orders, rules or regulations shall be deemed to be a material breach of the terms and conditions of our Purchase Order.

You warrant, covenant and certify that no convict, slave, forced labor, child (younger than the legal age for completing compulsory education and in no event less than 14 years of age) or indentured labor will be used by you, or any entity with whom you have subcontracted (subject to any subcontracting restrictions set forth herein) to process, manufacturer, label or ship the Merchandise. All wages, benefits and working hours set by you and all of the entities with whom you have subcontracted (subject to any subcontracting restrictions set forth herein) to process, manufacture, label or ship the Merchandise will comply with all Applicable Laws.

**CUSTOMS-TRADE PARTNERSHIP AGAINST TERRORISM**

As a participant in the Customs-Trade Partnership Against Terrorism (C-TPAT) program, Kohl's is committed to strengthening overall supply chain security, and Kohl's expects its supply chain business partners to share that commitment. To that end, you hereby expressly agree: (i) to provide all requested assistance to Kohl's necessary to fulfill Kohl's C-TPAT commitments and obligations; and (ii) to comply with any and all current or future laws,

Page 5

regulations, rules, industry guidelines or recognized best practices relating to supply chain security and anti-terrorism. Without limiting the foregoing, you agree to follow any relevant requirements, guidelines or instructions set out by the U.S. Customs and Border Protection (www.cbp.gov), including, but not limited to, having a written security procedure plan in place that addresses physical security, access controls, procedural security, personnel security, education and training awareness and threat awareness.

**INDEMNIFICATION:**    In addition to any other indemnification obligations set forth herein, you agree to defend, indemnify and hold us harmless against any Claims, which may result from your breach of the warranties and representations contained in our Purchase Order or as a result of your negligence, recklessness or intentional misconduct, or as a result of any allegations concerning the Merchandise in any way, including, but not limited, assertions regarding product safety or other Merchandise defects.

You warrant and represent that your workers are treated fairly and who in all cases are performing work voluntarily, not put at risk of physical harm, fairly compensated, and allowed the right of free association and not exploited in anyway. In addition to representing and warranting that you will fully comply with Kohl's Terms of Engagement for Kohl's Business Partners, you further warrant and represent that you have not: (a) utilized child labor (child who is younger than the local age for completing compulsory education and in no event less than 14 years of age); (b) utilized prison or forced labor (forced labor is work or service which is extracted from any person under the threat of penalty for its nonperformance and for which the worker does not offer himself voluntarily); (c) engaged in discriminatory practices on the basis of gender, racial characteristics, age, cultural or religious beliefs; (d) permitted the use of corporal punishment or other forms of mental or physical coercion or intimidation; and (e) engaged in bribes, kick-backs or other similar unlawful or improper payments to any person or entity to obtain or retain business. You further warrant and represent that your workers are covered by workers compensation insurance to the full extent required by Applicable Law. You agree to defend, indemnify and hold us harmless from your breach of these warranties and representations, or any other representations or warranties contained herein. If you breach these warranties and representations, we may take all appropriate corrective action, which may include cancellation of this Purchase Order or any other Purchase Orders placed with you by us in addition to any other remedies at law or in equity.

**WRITTEN WARRANTIES:**    In addition to the warranties contained herein, if a written warranty is offered with any Merchandise included in our Purchase Order, you shall ensure that all such warranties and any communications relating thereto comply with all Applicable Laws. You further agree to provide as many copies of any such additional warranties or communications as may be required by us from time to time.

**INFRINGEMENT:**    You grant to us a nonexclusive, royalty free right to use certain of your trademarks, tradenames, brand logos, graphics, packaging images and copyrights relating to the Merchandise to be incorporated into our advertising, merchandising, promotional materials, press kits, in-store graphics and on our websites. You warrant, covenant and represent that these materials, the Merchandise delivered pursuant to our Purchase Order and your conduct (or that of your agents) will not infringe or encroach upon the contractual or proprietary rights of any other person, firm or corporation, including without limitation, the designs, design patents, trademarks, trade names, trade dress, copyrights, rights of privacy and publicity, trade secrets and other proprietary/intellectual property rights of any third party and you agree to defend, indemnify and hold us harmless from any Claim, which arises, grows out of or results from any claim of infringement of patents, copyrights, trademarks, tradenames, trade secrets or any other proprietary/intellectual property rights, or any claim of unfair competition, in connection with the Merchandise covered by our Purchase Order.

**DEFECTIVE**    We reserve the right to cancel, without your authorization, at any time, any unshipped

Merchandise Purchase Order Terms and Conditions

**MERCHANDISE:**    portion of our Purchase Order and to return at any time, for full credit at your expense (including but not limited to cost of packing and transportation to and from source) and risk, all or any part of materials or Merchandise shipped hereunder which is defective in material or workmanship or which differs in any way from the terms, specifications and warranties herein contained or implied by law (including, without limitation, Merchandise shipped in excess of quantities ordered and Merchandise which deviates from sizes, colors, styles and quality ordered), and you shall have no right thereafter to cure such defects or failure to conform to such specifications and warranties. In the event you fail to accept or facilitate our return of defective and/or damaged merchandise within a reasonable period of time after receiving our notice, then we shall, in addition to all other rights and remedies set forth herein or available under law or equity, have the right to dispose of the defective and/or damaged merchandise as we see fit and you shall waive all rights to the defective and/or damaged merchandise thereafter. We reserve the right (but shall not be obligated) to repair any defects and debit your account with the expenses involved when in our sole judgment the cost of making such repairs would be less than the cost of replacement by you or cancellation of our Purchase Order.

**SAMPLES:**    All Merchandise shall conform to Merchandise samples previously approved by us. No change or deviation from the Merchandise samples or the method of production shall be made without our prior written approval. If samples are requested by our Purchase Order, you shall not forward quantity shipments until we have approved the samples submitted by you fabricated by the method to be used in such quantity shipments.

**NONCONFORMING**
**MERCHANDISE:**    We reserve the right to reject or cancel any unshipped portions of our Purchase Order and return, for full credit and without prior authorization, at your expense and risk, all or part of any shipments (whether in our possession or in transit) should any Merchandise differ in any way from the terms, specifications, or warranties implied by law or contained in our Purchase Order or in our Vendor Partnership Requirements relating to our Purchase Order. Any such nonconforming merchandise shall be treated as defective merchandise, as set forth above. .Merchandise will be returned to you F.O.B. our specified receiving location, freight collect. Nonconforming or defective Merchandise bearing any Kohl's Identification or any trademarks, trade names, licensed by us and any artwork or graphic designs adopted, produced or designed by you for us may not be disposed by you within the United States without our prior written consent, which may be withheld at our sole and absolute discretion.

**MERCHANDISE TESTING:**    Merchandise shall comply and be accompanied by such material as necessary to comply with all Applicable Laws. Merchandise shall have been subjected to reasonable and representative tests, including in accordance with procedures under any Applicable Law including, but not limited to, all laws, rules and regulations referred to in the section of this Purchase Order entitled "Compliance With Laws; Vender Covenants." Merchandise must comply under the Flammable Fabrics Act and demonstrate that fabrics used or contained in the Merchandise fabric otherwise subject to the Act and covered by and in the form delivered under this Purchase Order are not so highly flammable as to be dangerous when worn by individuals and where required, are marked or labeled in accordance with and are otherwise promulgated thereunder and amendments made thereto. At our request, you shall immediately submit, at your expense, additional samples of the Merchandise ordered pursuant to our Purchase Order for additional testing or examination at laboratories of our choosing or approved by us. We further reserve the right (but not the obligation) to conduct additional testing at laboratories of our choosing, at your expense, for any Merchandise you previously shipped to us. Our right to require or perform such additional testing shall be in addition to any rights we have to inspect and examine such Merchandise. Our acceptance of any Merchandise tested or examined (or our failure or refusal to require submission of the Merchandise for additional testing or examination) shall not be deemed a waiver of any Merchandise specification, warranty or guaranty expressed herein or implied by law.

**MANUFACTURING:**    Upon our request, you shall provide us with specific information in such detail as we may reasonably request, as to the location(s) and method(s) of manufacturing Merchandise. You

shall provide us with prior written notice of any change in the location(s) of manufacturing Merchandise, and you shall be fully responsible for all costs and/or delays resulting from such changes. Without advance notice but during regular business hours, our designated representatives and any independent inspectors approved by us may inspect any production facilities at which any Merchandise or any components for Merchandise are being produced (including inspection of any of your facilities or facilities of any of your subcontractors and suppliers) and any and all Merchandise at any stage of production or delivery (including at the delivery point specified in the applicable Purchase Order). We may require you to have Merchandise inspected prior to its shipment to the United States, such inspection to be performed at your sole expense, by an independent inspector approved by us. Any inspection, any documentation thereof, and any corrective actions taken by you with respect to any Merchandise shall not be deemed an acceptance of any Merchandise, or a waiver of any non-conformities or defects in any Merchandise and shall not excuse any failure by you to deliver Merchandise in accordance with the terms of the applicable Purchase Order.

**CUSTOMER RETURNS:**  No printed materials or illustrations of any kind, including restrictions on consumers' rights to return Merchandise, except as required by law or approved in writing by us may be included anywhere with the packaging of the Merchandise which is the subject of our Purchase Order. In addition to any other remedies we may have hereunder, we may remove such offending materials and repackage the Merchandise at your expense.

**TIME FOR DELIVERY:**  Time is of the essence as to the dates specified herein for shipment and delivery. You bear sole responsibility for (i) shipment after the "cancel" date specified on our Purchase Order or (ii) shipment before the "shipping date" specified on our Purchase Order. In addition to any other rights or remedies set forth herein, violations of such shipment or delivery terms constitute a material breach, and may result in automatic cancellation of our Purchase Order, with Merchandise rejected by us may be returned to you without your authorization and at your expense, including our administrative expense.

**EXTRA CHARGES:**  Except as specified in our Purchase Order, in our Vendor Partnership Requirements, or as otherwise agreed to by us, in writing, the prices recorded on our Purchase Order are not subject to any additional or extra charges, including but not limited to charges for pre-packs, cartons, carton markings, hangers, price tickets, hang tags, hanging bars, handling, drop shipments, insurance, cartage or minimum orders or any taxes or excise charges levied on processors, manufacturers, wholesalers or otherwise.

**PRICE PROTECTION:**  Our Purchase Order is placed with the understanding that you are willing to sell the same Merchandise sold hereunder at equivalent prices and on proportionally equal terms to any other purchaser similarly situated. If, before the final delivery under our Purchase Order, you offer to sell Merchandise substantially of the same kind as ordered herein to any other purchaser similarly situated, at lower prices and/or on terms more favorable to the purchaser than stated in our Purchase Order, the prices and/or terms in our Purchase Order are hereby automatically revised to equal the lowest prices and/or most favorable terms at which you so offer to sell such Merchandise, and payment hereunder shall be made according to the lowest prices and the more favorable terms at which you so offered this Merchandise. You shall meet lower prices of legitimate competition or in lieu thereof, accept cancellation of this Purchase Order.

Kohl's independently sets its retail prices and expressly reserves, and you expressly recognize and acknowledge, Kohl's right to determine its own resale pricing for any and all Merchandise.

**DEBIT BALANCES:**  Upon written notice, you shall immediately refund any amount due us under our Purchase Order or for any other reason.

Merchandise Purchase Order Terms and Conditions

**SET-OFF:**

You agree that we may set-off any amounts which may become payable to you under our Purchase Order or otherwise against payment of any amounts due from you to us whether arising under our Purchase Order or otherwise.

**PASSAGE OF TITLE:**

We shall have no obligation to unpack or inspect the Merchandise prior to resale thereof. You shall be responsible for the consequences of negligent manufacturing and packing and for the consequences of negligent handling prior to the point when we assume ownership of the Merchandise. Payment of freight charges shall not determine passage of title or which party bears the risk of loss while Merchandise is in transit. Until we have inspected the Merchandise shipped under our Purchase Order and accepted it as being in conformity with our Purchase Order and all representations and warranties made by you with respect to such Merchandise, your delivery obligation shall not be deemed complete, nor shall title pass to us, notwithstanding that you were instructed to route the Merchandise to a consolidation facility prior to delivery to our receiving location. Risk of loss and damage to Merchandise shall pass from you to us only upon our receipt, inspection and acceptance of the Merchandise at our designated receiving facility or store location, regardless of which party pays the transportation costs.

**OVERSEAS IMPORTS:**

A.   All invoices for Merchandise must be written in the English language, must set forth prices solely in United States Dollars which is the currency on which payment will be made, and specify the country of origin, the name of an English-speaking employee of yours, if any, who has knowledge or can readily obtain knowledge of this transaction, the number of this Purchase Order, the style number and our item number shown on the Purchase Order, the quantities shipped, the carrier used and, if then available, the bill of lading number. All discounts and charges must be reflected separately on your invoice.

B.   All documentation required by the U.S. Customs laws and regulations, the Federal Trade Commission laws and regulations and rules of any other government or authority in order for the Merchandise to be delivered to our distribution centers (including, without limitation, commercial invoices, packing lists, country of origin declarations, applicable quotas, visas, textile declarations, bills of lading, or other governmental authorizations that may be required for lawful and expeditious export from the country origin and subsequent importation to us) is your responsibility and you must provide complete sets of such documentation, one for each of our distribution centers at the time of shipment. You shall comply with U.S. laws and regulations relating to the Merchandise and the shipment and transportation thereof, including the C-TPAT laws and regulations and you agree to maintain adequate records related thereto and certify your compliance to C-TPAT if you are requested to do so by us.

C.   You shall be liable for detention or referral of entry (by applicable governmental authorities) of any Merchandise that is shipped without proper documentation or other lawfully required identification. In the event that any assists are furnished to you by us, you will make an appropriate statement to that effect on your invoice.

D.   You warrant and represent that the price of Merchandise does not violate the United States Anti-Dumping laws. We reserve the right to cancel all or any part of this Purchase Order in the event that a preliminary determination is made by the administering authority pursuant to United States law that an industry in the United States is materially injured or is threatened with material injury, or the establishment of an industry in the United States is materially retarded by reason of imports of the Merchandise or goods similar to the Merchandise. In such event, we may cancel, without penalty, our obligations under this Purchase Order and at our option return all Merchandise delivered under this Purchase Order to you, at your expense, for full refund of the Purchase price, and you shall reimburse us for all costs incurred in connection therewith, including without limitation, round-trip

transportation. You agree to reimburse us for any dumping duties which we are required to pay on Merchandise.

E.   If shipment of all the Merchandise is not made by you between the earliest authorized shipping date and the cancellation date (both as set forth on our Purchase Order), we shall have the right, without liability and in addition to any other rights and remedies we may have under this Purchase Order, at law or in equity, to direct expedited routing of the Merchandise by air freight or other transportation method of our choice. We may direct you to prepay the air freight or other expedited freight charge in which case you will render a commercial invoice for the Merchandise at the total cost for the Merchandise plus the cost of the method of shipment specified on the Purchase Order hereof reflected separately. If the cost for shipment provided on the Purchase Order is not included in the total cost of the Merchandise, then if we pay the cost of expedited routing, you shall reduce the amount payable to you in respect of the Merchandise by the difference in the cost between expedited routing and the cost of the method of shipment specified on the Purchase Order and such cost of expedited routing and such reduction shall be reflected separately on your invoice rendered for the Merchandise.

F.   We reserve the right to cancel all or any part of this Purchase Order prior to taking delivery of the Merchandise covered hereby without any liability whatsoever to you in the event that the Merchandise covered by the Purchase Order is subject to any embargo, or any boycott of the Merchandise in the United States.

**NONCOMPLIANCE:**   All administrative expenses and charges incurred by us and caused by your deviation or violation of our Vendor Partnership Requirements and all shipping, routing or invoicing instructions relating to our Purchase Order, will be charged to you and deducted from our payments to you. Charges for any deviation or violation can be found in our Vendor Compliance materials highlighted in our Purchase Order or Vendor Partnership Requirements. In the event you dispute our imposition of charges for deviation or violation of our Vendor Partnership Requirements and fail to furnish our Accounts Payable Department with proof of your compliance with our Vendor Partnership Requirements within six (6) months following shipment of the Merchandise pursuant to our Purchase Order, you shall be deemed to have waived any claim to such imposition of charges.

**REMEDIES:**   You shall furnish us with proof of delivery of the Merchandise at our request. In the event of your failure to notify our Accounts Payable Department in writing within six (6) months following shipment of Merchandise pursuant to our Purchase Order of our nonpayment of your invoices, we shall have no further obligation to pay you for Merchandise shipped pursuant to our Purchase Order. You shall be barred from commencing an action or interposing a set-off against us for any action or set-off unless an action is commenced or set-off is interposed within one (1) year after the same accrues. Further, you shall be banned from filing a counterclaim or interposing a set-off, by reason thereof, including without limitation: (i) for monies due or to become due hereunder, (ii) for the amount of any discounts, allowances or other deductions from remittances made on account of Merchandise purchased hereunder, (iii) disputing our right to return all or any part of the Merchandise purchased hereunder, or (iv) the fact of the making of such returns, unless such action is commenced or set-off interposed within one (1) year after the same accrues. In addition to any other right or remedy provided for herein or by law or in equity, we reserve the right, without liability, in the event of your breach of our Purchase Order agreement, to purchase substitute items elsewhere and to charge you with any loss incurred. Any provision herein for delivery of Merchandise in installments shall not be construed as making your obligations severable. Shipments of Merchandise sent C.O.D. without our written consent will not be accepted and will be at your risk.

**Merchandise Purchase Order Terms and Conditions**

If any provision of any Purchase Order or these Terms and Conditions is held to be invalid, illegal or unenforceable by a court of competent jurisdiction, then such provision shall be deemed modified only to the extent necessary to make such provision enforceable by such court, and the invalidity, in whole or in part, of any portion of our Purchase Order or these Terms and Conditions shall not impair or affect the validity or enforceability of the remaining provisions of such agreements.   All rights and remedies under our Purchase Order are cumulative and the exercise of any right or remedy herein provided shall be without prejudice to the right to exercise any other right or remedy provided for herein or at law or in equity.

**WAIVER:**

Our waiver of any term or condition of our Purchase Order shall not constitute a waiver for purposes of any subsequent Purchase Order nor shall it constitute custom or usage for a course of performance between us insofar as subsequent Purchase Orders are concerned. With respect to any shipment moving to our specified receiving location on freight prepaid terms, you will indemnify and hold us harmless from any and all freight, storage, accessorial, or demurrage charge claims assessed by any carrier. You shall indemnify us and hold us harmless from any Claims arising in any way out of your breach of any term or condition contained herein.

**BACK ORDERS OR PARTIAL SHIPMENTS:**

Unless otherwise specified, all back orders must be shipped prepaid, F.O.B. our specified receiving facility or department store location.

**CARTON WEIGHT, MARKINGS AND DIMENSIONS:**

Maximum carton weight, dimensions and required carton markings acceptable to us are stated in our Vendor Partnership Requirements from time to time. We may elect to accept or reject nonconforming cartons at our option. If we elect to accept nonconforming cartons, we may charge you for administrative expenses as provided in our Vendor Partnership Requirements.

**ELECTRONIC DATA INTERCHANGE TRANSACTIONS:**

Transactions under this Purchase Order may be effected by paper based documentation or by electronic data interchange (EDI) and EDI documentation that is in accordance with industry guidelines and the terms of this Purchase Order, unless otherwise invalid, shall be enforceable hereunder. You and we desire to be bound by EDI transactions between us and that such EDI transactions shall be subject to all the terms and conditions contained in our Purchase Order, our Terms of Engagement and our Vendor Partnership Requirements, as may be modified from time to time. We agree that no written document is required in order to make our EDI binding; that no signatures shall be required by either of us in order to make our EDI transactions legally binding; and that the confidential codes used by you and us in order to transmit information to each other shall satisfy any "signature" requirements. Transmittal of our Purchase Order shall constitute acceptance by you upon receipt by your computer. Our Purchase Order may be accepted by you as otherwise provided in our Purchase Order. Nothing contained herein creates any responsibility on our part to buy any specific Merchandise or any specific quantity thereof. We shall each bear our own EDI related costs, including any equipment, software and services required for efficient, reliable EDI transactions and for security procedures sufficient to ensure that EDI transmissions are authorized and protected from improper access.

**UPC ERRORS:**

Merchandise shipped by you with UPC errors will result in a penalty of 3% of the total item cost of our Purchase Order. UPC errors include but are not limited to:  Unauthorized Vendor substituted Merchandise, causing a not-on-file problem; Merchandise marked with incorrect bar code; and machine readable UPC codes inconsistent with the corresponding human readable code; Merchandise not bearing a UPC code; Vendor issued UPC codes with illegible bar codes.

**CONFIDENTIALITY:**

All Proprietary Information (as hereinafter defined) is confidential and our sole and exclusive property notwithstanding how you were provided access to it by us.  You shall not in any manner use, reproduce or disclose, directly or indirectly, to any of your employees, agents, affiliates or any third party at any time any Proprietary Information except in connection with

Terms and Conditions
04/2008

**Merchandise Purchase Order Terms and Conditions**

your performance under a Purchase Order and then only to the minimum extent necessary on a need to know basis. Proprietary Information that is provided by us to you via our website shall only be made available by you to persons authorized by us to view or receive it and only as permitted by our Terms of Use of our website. Proprietary Information shall only be used by you in a manner consistent with our Information Security policies, in effect from time to time. Upon demand by us, you shall deliver to us immediately all materials containing Proprietary Information in your possession (whether prepared by us or you).

Proprietary Information shall consist of: (A) all information relating to our sales, pricing, costs, inventory, operations, plans, programs, Merchandise purchased by us from you, and all information related to such Merchandise purchases, including, but not limited to shipment and transportation thereof and reports relating thereto; (b) all of our trade secrets including any and all customer lists, customer survey responses and any other information concerning any of our customers; (c) specifications to the extent furnished by us; (d) patent applications, Copyrights, trademarks and other Kohl's intangible/intellectual property owned or licensed to us; (e) all information provided by us to you via our website, including, but not limited to Unit Planning Reports from our Projection Analysis, Sales and Inventory Reports from Kohl's Data Warehouse and our Vendor Score card; and (f) any other information provided by us to you that is not publicly available regardless of where located or the manner or medium by which you have been provided access to it by us.

You acknowledge that you are or have been authorized to access Proprietary Information through our secure website www.connection.kohls.com and you warrant and agree to comply with our Information Security policies (located in the files tab of this site) relating thereto, as such policies may be amended or modified from time to time. You shall use your best efforts to prevent unauthorized access to our website and access to any databases or other sensitive material generated from or used in conjunction with our website. You shall not provide access to or disclose information or data contained on our website to any employee, agent, affiliate or any third party who is not authorized to view this information or data by Kohl's. You will use your best efforts to ensure that authorized persons do not disclose Proprietary Information to others without our express, prior written permission. You will immediately notify us at is-securitytech@kohls.com in the event you discover any security breaches relating to our Proprietary Information.

You agree to defend, indemnify and hold us harmless from your breach of the warranties and representations contained herein. The provisions of this Section shall survive the cancellation or termination of any Purchase Order.

**RESERVATION OF KOHL'S RIGHTS:**

We reserve the right to advertise, offer Merchandise for sale and to sell such Merchandise at any retail facility and/or by means of any medium, including electronic or other non-traditional facilities or venues. The foregoing reservation is an essential term of all of our transactions effected under or pursuant to this Purchase Order.

**ON-SITE VENDOR EMPLOYEES:**

You are fully responsible for all losses or damages incurred as a result of your performance of any services at our facilities, whether performed by you, your employees, agents, affiliates and/or subcontractors. In addition to any other indemnification obligations set forth herein, you agree to defend, indemnify and hold us harmless from any and all Claims arising out of or in any manner resulting from your use of, or performance of any services at, our facilities including, but not limited to: (i) any act, omission or negligence by you, your employees, agents, affiliates and/or subcontractors; and (ii) damage to or destruction of personal or real property of Kohl's or any third party or the injury or death to persons, including without limitation, employees or invitees of Kohl's and you, your employees, agents, affiliates and/or subcontractors. You shall, by entering upon and using any Kohl's facilities, be deemed to have accepted the Kohl's facilities in its then condition. We assume no liability for damage to or loss of your property or the property of your employees, agents, affiliates and/or subcontractors. You acknowledge that any services you conduct at Kohl's facilities are conducted entirely at your own risk, and you hereby release us from any claims, liability or

**Merchandise Purchase Order Terms and Conditions**

loss occurring at our facilities. You agree to use best efforts not to hinder any of our operations or to detract from our customer experience while at our facilities. You shall immediately remove all materials, equipment and rubbish you place on our facilities, and restore, at your sole cost and expense, our facilities to the condition it was in immediately prior to your entrance onto the facilities.

**OFFER OF EMPLOYMENT:**
It is an essential and material term and condition of this Purchase Order and you expressly represent, warrant, acknowledge and agree that during the term of this Purchase Order and for a period of twelve (12) months after your last shipment of Merchandise to Kohl's, you will not, without our consent, solicit, extend an offer of employment to, employ, retain, hire, engage (or attempts any of the foregoing ) or otherwise secure the services of a person who at the time of your conduct or within the preceding ninety (90) days was employed by us (or any of our affiliates doing business with you) in the position of Merchandise Analyst, Assistant Buyer, Assistant Product Manager or an equivalent or superior position. We may terminate and cancel any Purchase Order, in whole or in part, in the event that you breach this provision. In addition, you expressly acknowledge and agree that we are not limited to the remedies set forth in this Agreement for a breach of the Agreement, and have available any form of damages or any injunction or equitable relief, for misappropriation of trade secrets, unfair competition, breach of contract, interference with business relations or other cause of action arising from or out of any attempts to solicit, extend an offer of employment to, employ, retain, hire, or engage any such employee.

**INDEPENDENT CONTRACTOR:**
You are an independent contractor. No provision of this Purchase Order shall or shall be deemed or construed to create any other relationship between the parties such as employer and employee, principal and agent, partners, joint venturers, or any other association other than that of independent contractors. Accordingly, you are not and shall not be deemed to be an agent of us and are without any authority to enter any contract or take any action on behalf of us or so as to obligate us or any or our affiliates. Except as otherwise specified herein, you shall have exclusive control and direction over the manner, means, details and methods by which you shall perform the services hereunder (including, without limitation, any services you may provide related to the stocking or presentation of Merchandise for sale in our stores), and shall be solely responsible for the provision of all tools, equipment, and facilities necessary for the performance and for the payment of all license and other fees applicable to your performance.

**AUDIT:**
During normal business hours, we shall have the right to inspect and audit your records and documents with respect to your sales to us to ensure that you are in compliance with the provisions of this Purchase Order.

**BENEFICIARY OF AGREEMENT:**
All of our affiliates are and shall be deemed to be third party beneficiaries of this Purchase Order. We and each of our affiliates shall be deemed to be a third party beneficiary of your agreement(s) with any third party as to the production or distribution of the Merchandise and any component thereof.

**SEVERABILITY:**
The unenforceability or illegality of any provision of this Purchase Order shall not render any other provision of this Purchase Order unenforceable, null or void so long as the provisions remaining are sufficient to constitute a legally binding agreement.

**ENTIRE AGREEMENT:**
This Purchase Order, including attachments and material incorporated herein by reference, constitutes the entire agreement of the parties as to its subject matter. It supersedes all prior representations or agreements, oral or otherwise, with respect thereto. No obligation to enter into any further transaction may be implied from this Purchase Order. This provision is applicable in all circumstances, without regard to whether this Purchase Order establishes a new transaction, confirms an existing arrangement or prior course of dealing between us.

**MISCELLANEOUS:**
As used in our Purchase Order, the words "you" or "your" refer to Vendor, as Seller and the words "we", "us" and "our" refer to Kohl's Department Stores, Inc. or its subsidiaries or

**Merchandise Purchase Order Terms and Conditions**

affiliates, as buyer. Our Purchase Order shall be governed by and construed in accordance with the laws of the State of Wisconsin. Any suit, action or proceeding against us with respect to our Purchase Order or the parties' relationship or actions with respect thereto shall be brought in Waukesha County, Wisconsin, or in the United States District Court for the Eastern District of Wisconsin and you hereby submit to the exclusive jurisdiction of such courts for the purpose of any suit, action or proceeding. You waive any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

Kohl's Department Stores, Inc.
N56 W17000 Ridgewood Drive
Menomonee Falls, WI  53051

Contact us:
Web site: https://www.connection.kohls.com.
E-mail: kohlslaw@kohls.com

# EXHIBIT C

Kohl's Department Stores
Electronic Data Interchange
Trading Partner Agreement

This Electronic Data Interchange Trading Partner Agreement (the "Agreement") is made as of ___2/13___, 2008 by and between Kohl's Department Stores, Inc. ("Kohl's") with offices at N56 W17000 Ridgewood Drive, Menomonee Falls, WI 53051 and __Fu Da International, Ltd.__ ("Vendor"), with offices at __525 7th Ave. 23rd FL. New York, NY 10018__.

## RECITALS

Kohl's and Vendor desire to facilitate purchase, shipping and sales transactions all in accordance with Kohl's Vendor/EDI Partnership Requirements as detailed at Kohl's website, http://www.connection.kohls.com ("Transactions") by electronically transmitting and receiving data in agreed formats in substitution for conventional paper-based documents, and to assure that such Transactions are not legally invalid or unenforceable as a result of the use of available electronic technologies for the mutual benefit of the parties.

NOW THEREFORE, the parties, intending to be legally bound agree as follows:

### Section 1. Prerequisites.




1.1 Documents: Standards. Each party may electronically transmit to or receive from the other party any of the transaction sets listed in the Appendix, (transaction sets which the parties regularly transmit) and transaction sets which the parties by written agreement add to the Appendix, or any other customized files solely developed between the parties (collectively "Documents"). Any transmission of data, which is not a Document, shall have no force or effect between the parties unless justifiably relied upon by the receiving party. All Documents shall be transmitted in accordance with the standards set forth in the Appendix.

1.2 Communications Service Provider

1.2.1 Documents will be transmitted electronically to each party through a third party network or through an AS2/FTP connection direct to/from Kohl担

1.2.2 Each party shall be responsible for the costs of its communication, if any.

1.2.3 The originating party shall be responsible/liable for any acts or omissions while transmitting, receiving, storing, or handling documents, or performing related activities.

1.3 System Operations. Each party, at its own expense, shall provide and maintain the equipment, software, services and testing necessary to effectively and reliably transmit

and receive Documents.

1.4 Security Procedures. Each party shall properly use those security procedures, if any, which are reasonably sufficient to ensure that all transmissions of Documents are authorized and to protect its business records and data from improper access. Both parties shall use encrypted technology to ensure that the transactions are maintained confidential.

1.5 Signatures. Each party shall adopt as its signature an electronic identification consisting of symbol(s) or code(s) which are to be affixed to or contained in each Document transmitted by such party ("Signatures"). Each party agrees that any Signature of such party affixed to or contained in any transmitted Document shall be sufficient to verify such party originated such Document. Neither party shall disclose to any unauthorized person the Signatures of the other party.

Section 2. Transmissions.

2.1 Proper Receipt. Documents shall not be deemed to have been properly received, and no Document shall give rise to any obligation, until accessible to the receiving party at such party's receipt computer. Either party may designate a different receipt computer at any time upon at least 24 hours prior notice to the other party.

2.2 Verification. Upon proper receipt of any Document, the Vendor shall transmit a functional acknowledgement in return no later than 24 hours after receipt of original data.

2.3 Receipt of Data Not Intended for Receiver. Upon discovery of receipt of any transmission not intended for the Vendor, the Vendor will take immediate action to inform Kohl's of this error. Vendor will delete the information contained in such transmission.

2.4 Frequency of Mailbox Access. Both parties agree to access their respective mailboxes on a regular schedule at least once every 24 hours or as otherwise noted in the Appendix. Either party should notify the other the same day if they are unable to access their mailbox. As it relates to data retrieval via AS2 or FTP, both parties agree to retrieve data on a regular schedule at least once every 24 hours or as otherwise noted in the Appendix. Either party should notify the other the same day if they are unable to retrieve the data.

2.5 Duplicate Transmissions. Each party shall have the capability to identify and isolate duplicate transmissions.

### Section 3. Transaction Terms.

3.1 Terms and Conditions. Vendor acknowledges and agrees to the Vendor/EDI Partnership Requirements including but not limited to all purchase orders and shipping requirements (as amended from time to time) as detailed at Kohl's website, http://www.connection.kohls.com.

3.2 Confidentiality. All information contained in any Document or otherwise exchanged between the parties shall be considered confidential between Kohl's and the Vendor, unless otherwise agreed to, in writing, by the provider of the information. In the event of a breach of this section, the non-breaching party shall be entitled to an injunction against the breaching party in addition to all other legal or equitable remedies. This section shall survive termination of this Agreement.

### 3.3 Validity: Enforceability.

3.3.1 This Agreement has been executed by the parties to evidence their mutual intent to create binding purchase and sale obligations as described herein. Fax or pdf signatures are binding on the parties hereto.

3.3.2 Any Document properly transmitted pursuant to this Agreement shall be considered, in connection with any Transaction, any other agreement/requirement as referred to in this Section 3, or this Agreement, to be a "writing", or "in writing"; and any such Document when containing, or to which there is affixed, a Signature ("Signed Documents") shall be deemed for all purposes to have been "signed" and to constitute an "original" when printed from electronic files or records established and maintained in the normal course of business.

3.3.3 The conduct of the parties pursuant to this Agreement, including the use of Signed Documents properly transmitted pursuant to this Agreement, shall, for all legal purposes, evidence a course of performance accepted by the parties in furtherance of the Agreement.

3.3.4 The parties agree not to contest the validity or enforceability of Signed Documents under the provisions of any applicable law relating to whether certain agreements are to be in writing or signed by the party to be bound thereby. Signed Documents, if introduced as evidence on paper in any judicial, arbitration, mediation or administrative proceedings, will be admissible as between the parties to the same extent and under the same conditions as other business records originated and maintained in documentary form. Neither party shall contest the admissibility of copies of Signed Documents under either the business records exception to the hearsay rule or the best evidence rule on the basis that the Signed Documents were not originated or maintained in documentary form.

3.3.5 Nothing in this Agreement shall be deemed to create any responsibility on either party to buy or sell any specific goods. This Agreement is solely intended to facilitate the buying and selling transactions of the parties. Neither party shall be required to do business with the other for any certain period of time.

Section 4. Miscellaneous.

4.1 Termination. This Agreement shall remain in effect until terminated by either party with not less than 10 days prior written notice, which notice shall specify the effective date of termination; provided, however, that any termination shall not affect the respective obligations or rights of the any Documents or otherwise under this Agreement prior to the effective date of termination.

4.2 Severability. Any provision of this Agreement which is determined to be invalid or unenforceable will be ineffective to the extent of such determination without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such remaining provisions.

4.3 Entire Agreement. This Agreement and the Appendix constitute the complete agreement of the parties relating to the matters specified in this Agreement and supersede all prior representation or agreements, whether oral or written, with respect to such matters. No oral modification or oral waiver of any of the provisions of this Agreement shall be binding on either party. No obligation to enter into any Transaction is to be implied from the execution or delivery of this Agreement. This Agreement is for the benefit of, and shall be binding upon, the parties and their respective successors and assigns.

4.4 Governing Law. This Agreement shall be governed by the interpreted in accordance with the laws of the State of Wisconsin and exclusive jurisdiction of any dispute, claim or lawsuit arising from the agreement shall be Waukesha County, Wisconsin. 

4.5 The parties to this Agreement may send and receive purchase and sale documents electronically themselves through direct interchange or through a third party. If one party to this Agreement selects a third party to facilitate the electronic interchange, the party selecting that third party shall bear responsibility for any mistakes or negligence of the third party. If both parties jointly select a single third party to facilitate electronic interchanges, responsibility for any mistakes or negligence of the third party shall be borne by the parties hereto equally.

Each party has caused this Agreement to be properly executed on its behalf as of the date first above written.

Kohl's Department Stores, Inc.

By: _____

Name: _____

Title: _____

Vendor _____

By: _____

Name: _____

Title: _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
FU DA INTERNATIONAL, LTD.,                          Docket No.: 08 CV 5164

                          Plaintiff,

                                                    AFFIDAVIT OF SERVICE

          -against-

KOHLS DEPARTMENT STORES, INC.,

                          Defendant,

-------------------------------------------------------------------X

STATE OF NEW YORK      )
                       ) SS.:
COUNTY OF NASSAU       )

          David Greenberg, being duly sworn, deposes and says:

          That deponent is not a party to the action, is over 18 years of age, and resides in New York.

          That on the 14th day of July, 2008, deponent served the within Motion and Memorandum of Law

upon:

          SCHLACTER & ASSOCIATES
          Attorneys for Plaintiff
          450 Seventh Avenue
          New York, NY 10123
          (212) 695-2000

The addresses designated by said attorneys for that purpose by depositing a true copy of same enclosed in
a postpaid properly addressed wrapper in an official depository under the exclusive care and custody of the
United States Post Office Department within the State of New York.

                                                    David Greenberg

Sworn to before me this
_14_ day of _July_ 2008

_____
Notary Public

          SALLY TAYLOR
     Notary Public, State of New York
          No. 01TA6126220
     Qualified in Nassau County
     Commission Expires May 2, 2009